UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

CENTRAL ILLINOIS CARPENTERS           :    Civil Action No.
HEALTH & WELFARE TRUST FUND,          :
Individually and on Behalf of All Others   :    <u>CLASS ACTION</u>
Similarly Situated,                   :
                                      :
                        Plaintiff,    :
                                      :
            vs.                       :
                                      :
MASONITE INTERNATIONAL                :
CORPORATION, HOWARD C. HECKES,        :
and RUSSELL T. TIEJEMA,               :
                                      :
                        Defendants.   :    <u>DEMAND FOR JURY TRIAL</u>

———————————————————————— x

**COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS**

Plaintiff Central Illinois Carpenters Health & Welfare Trust Fund ("Plaintiff"), on behalf of itself and all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings by Masonite International Corporation ("Masonite" or the "Company"), conference call transcripts, Company press releases, and media reports about the Company, as well as publicly available information about Owens Corning. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all sellers of the common stock of Masonite between June 5, 2023 and February 8, 2024, inclusive (the "Class Period"), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, against Masonite and certain of the Company's senior officers and directors during the Class Period ("Defendants," defined fully below).

2.     This action arises from Defendants' material omissions and misrepresentations concerning Owens Corning's offers to purchase all of Masonite's outstanding common stock at significant premiums to the Company's stock price and the Company's repurchases of millions of dollars' worth of its shares without disclosing material nonpublic information about Owens Corning's offers, which, if disclosed as required, would have indicated to investors that Masonite's stock was worth significantly more.

3.    The Class Period begins on June 5, 2023.  On that date, Owens Corning approached Masonite with a credible offer to acquire all of the Company's outstanding stock for $120.00 cash per share – a significant cash premium over Masonite's then stock price of $94.09 per share. Confirming the seriousness of Owens Corning's offer, Masonite's Board of Directors (the "Board") created an "Advisory Committee" of certain directors and senior management, including defendant Heckes (defined below), which would, among other things: (i) consider retention of experienced financial advisors; (ii) analyze the proposal; and (iii) prepare materials and analysis to assist the Board in evaluating and responding to the proposal.  The Board eventually engaged with Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton") and Goldman Sachs & Co. LLC ("Goldman Sachs") for legal and financial advice.  At the same time Defendants were evaluating and seriously considering the first credible offer from Owens Corning, Defendants repurchased over 79,000 shares of its own shares in just one month at an average price of $90.15 per share.

4.    Although Masonite declined the first offer, Defendants continued to engage with Owens Corning, which was determined to acquire the Company and returned with repeated offers at significant premiums to Masonite stock's market price, culminating in Owens Corning's acquisition of Masonite at a significant premium in February 2024.

5.    Defendants violated §10(b) and Rule 10b-5 by failing to either abstain from trading in Masonite's stock or to disclose Owens Corning's offer(s) while buying back Masonite's stock.  The magnitude of the proposed transaction, the credibility of the bid by a company of Owens Corning's stature, and the degree of interest shown by Owens Corning, in total, illustrate that the Owens Corning's offer would have been material and significant to a reasonable investor in making their investment decision.

- 2 -

6.     Defendants' violations continued throughout the Class Period, as they failed to disclose the subsequent offers made by Owens Corning.  In total, Owens Corning made six offers to acquire Masonite:  (i) on June 5, 2023, for $120.00 cash per share; (ii) on July 13, 2023, for $128.00 cash per share; (iii) on September 25, 2023, for $132.00 cash per share; (iv) on November 20, 2023, for $120.000 cash per share; (v) on January 3, 2024, for $132.00 cash per share; and (vi) on January 31, 2024, for $133.00 cash per share.  Defendants seriously considered each proposal and continued to engage with Owens Corning even after rejecting a proposal, in the hopes of receiving an improved offer.  Contemporaneous with most of these credible offers from Owens Corning, Defendants continued to repurchase Masonite shares throughout the Class Period.  Specifically, as reported in the Company's SEC filings, Masonite repurchased: (i) approximately 106,000 shares for an average price of $94.05 per share during the third quarter of 2023; and (ii) approximately 83,000 shares for an average price of $88.88 per share during the fourth quarter of 2023, despite knowing that Owens Corning was offering a significant premium to Masonite's then stock price.

7.     During this same time, beginning in November 2023, Masonite began making formal offers to acquire PGTI (defined fully below).  During these negotiations, Masonite kept investors entirely in the dark, even as the negotiations escalated.  On December 18, 2023, Masonite and PGTI announced they had entered into a definitive agreement whereby Masonite would acquire all outstanding PGTI common stock for $41.00, comprised of $33.50 in cash and $7.50 in Masonite common shares.

8.     On January 2, 2024, PGTI announced that MITER Brands provided to PGTI an unsolicited proposal to acquire PGTI for $41.50 per each PGTI share.  On this news, Defendants scrambled back to Owens Corning, reengaging in negotiations for a potential sale.  Ultimately,

Defendants decided not to match or exceed the unsolicited offer from MITER Brands, and instead focused on the potential transaction with Owens Corning.

9.     After playing both sides, *i.e.*, exploring a sale to Owens Corning and the acquisition of PGTI, on February 9, 2024, Masonite announced that it successfully negotiated the transaction with Owens Corning.

10.    Masonite made no disclosure concerning Owens Corning's offers for approximately eight months, while the Company repurchased millions of dollars of its own shares at prices far below Owens Corning's offers.  In total, Masonite repurchased nearly 270,000 of its outstanding shares from unsuspecting investors for approximately $25 million between June 2023 and December 2023, despite knowing that Owens Corning was continuously proposing offers at a significant premium to Masonite's then stock price.  At the same time, Defendants made numerous misleading statements touting this significant repurchase activity, repeatedly updating investors about these buybacks during the Class Period and telling investors the buybacks were meant to "distribut[e] capital back" to investors, all with no disclosure concerning Owens Corning's credible offer(s) to acquire Masonite shares at materially higher prices.  Masonite also affirmatively represented to investors that its repurchases complied with Rule 10b5-18, which does not permit repurchases while aware of material nonpublic information.  As a result, Masonite omitted material information about Owens Corning's offers that the Company had a duty to disclose, and Defendants made material misrepresentations about Masonite's repurchases, in violation of the federal securities laws.

11.    When investors learned the truth that Owens Corning was willing to buy all of the Company's outstanding stock for a significant premium above the trading price, Masonite's stock price climbed sharply.

12.     This action seeks damages on behalf of sellers of Masonite stock during the Class Period who were harmed as a result of these violations of the federal securities laws by Defendants.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

15.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in this District.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE").  During the Class Period, Masonite common stock traded on the NYSE.

## PARTIES

**Plaintiff**

17.     Plaintiff Central Illinois Carpenters Health & Welfare Trust Fund, as set forth in the accompanying certification, which is incorporated here by reference, sold Masonite common stock during the Class Period and was damaged thereby.

**Defendants**

18.     Defendant Masonite is a British Columbia corporation with its corporate headquarters located at 1001 East Palm Avenue, Tampa, Florida 33605.  Masonite is a leading global designer,

manufacturer, marketer, and distributor of interior and exterior doors and door solutions for the residential and non-residential building construction markets' new construction and repair, renovation and remodeling sectors.  Since May 2024, Masonite operates as Owens Corning's Doors business unit after being acquired by Owens Corning.  During the Class Period, Masonite common stock traded in an efficient market on the NYSE.  As of February 27, 2024, Masonite had outstanding approximately 22 million shares of common stock.

19.    Defendant Howard C. Heckes ("Heckes") was, at all relevant times, President, CEO, and a member of the Board.

20.    Defendant Russell T. Tiejema ("Tiejema") was, at all relevant times, Executive Vice President and CFO at Masonite.

21.    Defendants Heckes and Tiejema were senior executives of Masonite and are sometimes referred to herein as the "Individual Defendants."

22.    Masonite, Heckes, and Tiejema are collectively referred to herein as "Defendants."

23.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose nonpublic facts known to them about Masonite and the true market value of its common stock. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on sellers of Masonite common stock was a success, as it: (i) deceived the investing public regarding Masonite's prospects; (ii) artificially deflated the market price of Masonite common stock; and (iii) caused Plaintiff and other members of the Class (defined herein) to sell Masonite common stock at artificially deflated prices.

24.    The Individual Defendants made, or caused to be made, materially false and misleading statements and omissions of material fact that caused Masonite's common stock to trade at artificially depressed or deflated levels during the Class Period.  The Individual Defendants,

because of their positions with the Company, possessed the power and authority to control the contents of, and had the ability and opportunity to prevent the issuance or cause the correction of, Masonite's public statements, as alleged in this Complaint.  Because of their positions with the Company and their access to material nonpublic information available to them but not to the public, the Individual Defendants knew that the facts specified in this Complaint had not been disclosed to and were being concealed from the market, and that Masonite's representations were materially false and misleading at the time they were made.  The Individual Defendants are liable for the material omissions and false and misleading statements pled in this Complaint.

## RELEVANT NON-PARTIES

25.    Owens Corning is a Delaware corporation with its corporate headquarters located at One Owens Corning Parkway, Toledo, Ohio 43659.  Owens Corning is a residential and commercial building products company focusing primarily on roofing products and systems, insulation projects, door and door systems, and fiberglass composites.  On May 15, 2024, Owens Corning acquired all outstanding common stock of Masonite.

26.    Brian Chambers ("Chambers") has served as Owens Corning's CEO since 2019 and Chair of Owen Corning's Board of Directors since 2020.

27.    PGT Innovations, Inc. ("PGTI"), a Delaware corporation with its corporate headquarters located at 1070 Technology Drive, North Venice, Florida 34275, is a manufacturer of aluminum and vinyl-framed windows and doors, as well as overhead garage doors.  Since March 28, 2024, PGTI has been owned and operated by MITER Brands.

## DEFENDANTS' FRAUDULENT SCHEME

28.    On February 24, 2016, the Masonite Board approved a share repurchase program under which Masonite could repurchase from time to time up to $150 million of its outstanding

common stock. Over the years, the Board approved additional share repurchase plans. On February 21, 2022, the Board approved an incremental $200 million share repurchase program (the "2022 Program"), the fifth such program approved by the Board.

29.    Under the 2022 Program, shares could be repurchased from time to time in open market transactions, in privately negotiated transactions, or otherwise, and the timing and the other terms of the repurchase depended on a variety of factors, including legal requirements, economic and market conditions, and other investment opportunities.

30.    As detailed further herein, at the time that Masonite was repurchasing Masonite stock throughout the Class Period, Defendants knew that Masonite had received a formal acquisition offer from Owens Corning to purchase all outstanding shares of Masonite common stock at prices significantly above the then-current market prices of Masonite common stock, and therefore significantly above the prices at which Masonite was repurchasing Masonite common stock from unsuspecting Class members. Accordingly, Masonite had an obligation to disclose that it had received a formal acquisition offer from Owens Corning or abstain from purchasing Masonite stock from unsuspecting investors. Masonite did not disclose this material information during the Class Period.

31.    The Class Period begins on June 5, 2023 – Masonite's stock opened at $94.09. On that day, defendant Heckes met in Tampa, Florida, with Chambers. During the meeting, Chambers expressed interest in pursuing a business combination between Masonite and Owens Corning. Chambers delivered to Masonite a letter memorializing Owens Corning's first offer to acquire all of the outstanding Masonite common shares for $120.00 cash per share (the "First OC Proposal"). Also on June 5, 2023, confirming the credibility of the First OC Proposal, defendant Heckes

forwarded the First OC Proposal to Robert J. Byrne ("Byrne"), then Chairman of the Board, and updated him on the discussion with Chambers.

32.    On June 9, 2023, the Board held a meeting with members of Masonite's senior management, including defendant Heckes.  Additionally, representatives from Wachtell Lipton, Masonite's legal advisor, were present.  During the meeting, defendant Heckes explained that, since receiving the First OC Proposal, Masonite had, among other things, discussions with Wachtell Lipton and meetings with several potential financial advisors to assist Masonite in evaluating and responding to the First OC Proposal.  Additionally, Masonite created an "Advisory Group" of certain directors and defendant Heckes, which would, among other things: (i) consider retention of experienced financial advisors; (ii) analyze the First OC Proposal; and (iii) prepare materials and analysis to assist the Board in evaluating and responding to the First OC Proposal.

33.    On June 11, 2023, the Advisory Group met with certain senior management, including defendant Tiejema, as well as representatives from Wachtell Lipton.  During the meeting, the Individual Defendants recommended selecting Goldman Sachs as financial advisor in connection with the potential transaction with Owens Corning.  The Advisory Group agreed, and the Board later approved the retention of Goldman Sachs.  Masonite subsequently entered into a formal engagement letter with Goldman Sachs.

34.    On July 6, 2023, the Board held another meeting with senior management and representatives from Wachtell Lipton and Goldman Sachs.  After reviewing and discussing preliminary financial analyses for the First OC Proposal, the Board determined that the First OC Proposal undervalued Masonite and authorized Masonite's management to reject the First OC Proposal.  The Board, however, did not close the door on a potential transaction with Owens Corning, and noted that if Owens Corning wished to present a higher proposal, the Board would

consider it.   On July 6, 2023, Masonite's common stock price closed at $96.53 per share, significantly below the First OC Proposal.   Thus, even though Masonite declined the First OC Proposal, Defendants were aware that Owens Corning was motivated to complete a transaction, and negotiations remained alive.

35.     The next day, Masonite sent Owens Corning a letter indicating that Masonite was not interested in engaging in further discussions based on the First OC Proposal.

36.     On July 13, 2023, Owens Corning delivered another letter to Masonite, detailing Owens Corning's revised proposal to acquire all of the outstanding Masonite common shares for $128.00 in cash per share (the "Second OC Proposal").   Defendant Heckes shared the Second OC Proposal with Byrne and updated him on the discussion with Chambers on the same date.   The Second OC Proposal was made available to the Board later that day.   The closing price of Masonite common shares on July 12, 2023 was $101.40 per share.

37.     The next day, on July 14, 2023, the Board held a meeting with senior management, as well as representatives from Wachtell Lipton and Goldman Sachs.   During the meeting, defendant Heckes noted that Chambers emphasized that the Second OC Proposal was based solely on publicly available information.   According to the Definitive Proxy Statement Relating to the Merger, filed with the SEC on March 22, 2024 (the "Proxy Statement"), the Board "determined that the Second OC Proposal continued to undervalue Masonite, *but the Board of Directors agreed that it would be in the best interest of Masonite and its shareholders to share certain strategic and financial information with Owens Corning*," so that Owens Corning would potentially make a proposal providing greater value than the Second OC Proposal.   The Board directed Masonite's management to coordinate with Wachtell Lipton about communicating this message to Owens Corning and providing a draft of a confidentiality agreement that would include a standstill.

38.     Despite agreeing that it would be in the best interest of Masonite shareholders to share strategic and financial information with Owens Corning after receiving the Second OC Proposal, Defendants consciously chose not to tell the public about its agreement to share financial information with Owens Corning, nor Owens Corning's offers to acquire Masonite.

39.     On July 19, 2023, Masonite and Owens Corning entered into a confidentially agreement that included an 18-month standstill with a fallaway provision.

40.     Beginning on August 2, 2023, representatives from Owens Corning and its advisors conducted diligence focused on Masonite's business strategy, financial projections and growth initiatives, and additional opportunities.  Members of Masonite's management engaged in these due diligence calls and virtual meetings with, and responded to written due diligence requests from, representatives of Owens Corning.  Representatives of Goldman Sachs also attended these calls and virtual meetings.

41.     After the market closed on August 8, 2023, and in the midst of providing material nonpublic information to Owens Corning in the hopes of receiving a better offer to acquire the Company, Masonite announced its financial results for the quarter ended July 2, 2023 ("2Q23").  Before the market opened on August 9, 2023, Masonite hosted an earnings call with analysts and shareholders to discuss the Company's 2Q23 financial results (the "Aug. 2023 Call").  During the Aug. 2023 Call, defendant Tiejema told analysts and investors that "[d]uring the second quarter, Masonite repurchased approximately 159,000 shares of stock for $14 million at an average price of $90.58."  Defendant Tiejema, however, failed to disclose that Masonite had received two offers to purchase all outstanding shares of Masonite common stock for $120.00 and $128.00 cash per share, respectively.

42.    Moreover, in the Company's Form 10-Q for 2Q23, dated August 9, 2023 (the "2Q23 Form 10-Q"), which was signed by defendant Tiejema, Masonite provided a month-by-month breakdown of its share repurchases for 2Q23:

| Date | Total Number of Shares Purchased | Average Price Paid Per Share |
|---|---|---|
| April 3, 2023 through April 30, 2023 | 23,891 | $88.26 |
| May 1, 2023 through May 28, 2023 | 56,124 | $92.17 |
| May 29, 2023 through July 2, 2023 | 79,130 | $90.15 |
| **Total** | **159,145** | **$90.58** |

43.    As demonstrated by the above chart, Defendants repurchased 79,130 shares of Masonite common stock during the period from May 29, 2023 through July 2, 2023, likely meaning that a significant portion of these purchases were made **after** Defendants received the First OC Proposal on June 5, 2023, and certainly before Defendants agreed to reject the First OC Proposal on July 6, 2023. Defendants nearly repurchased as many shares during the final month of 2Q23 (after the First OC Proposal) as in the first two months of 2Q23 combined. Defendants repurchased these shares for an average price of $90.15 per share, despite knowing – and refusing to disclose to investors – that Owens Corning was willing to pay at least $120.00 per share. Indeed, Defendants turned down the First OC Proposal because, in their opinion, it **undervalued** the Company. Defendants were aware that negotiations with Owens Corning remained alive. While Defendants disclosed these repurchases, they categorically failed to disclose the First OC Proposal.

44.    Masonite's 2Q23 Form 10-Q, stated the following regarding Masonite's share repurchase program:

Under this program, the Company may repurchase shares from time to time, depending on market conditions and alternate uses of capital. The timing and actual number of shares repurchased will depend on a variety of factors, including price, general business and market conditions and alternate uses of capital. The share repurchase program may be effected through Rule 10b5-1 plans, open market purchases, *each in compliance with Rule 10b-18 under the Exchange Act*, or privately negotiated transactions.

45.     The statement quoted above that Masonite's share repurchases complied with Rule 10b-18 remained current on the market as Masonite's most recent statement on this subject until the filing of Masonite's next Form 10-Q in November 2023.  Rule 10b-18 confers no immunity from possible Rule 10b-5 liability where the issuer engages in the repurchases while in possession of material, nonpublic information concerning its securities, or where purchases are part of a plan or scheme to evade the federal securities laws.  This statement became actionable and materially false and misleading when Masonite repurchased stock in June 2023 and subsequent months while aware of material nonpublic information concerning the First OC Proposal and Owens Corning's continuous interest in acquiring Masonite for a premium over its stock's market price.  At that time, Masonite and the Individual Defendants came under an obligation to either disclose the material nonpublic information about the First OC Proposal or abstain from trading Masonite stock.  Accordingly, Defendants had an obligation to update the statement quoted above, but failed to do so and instead continued to repurchase Masonite stock in violation of Section 10(b), Rule 10b-5, and Rule 10b5-1.

46.     On September 19, 2023, Masonite held a virtual Investor Day (the "Sep. 2023 Call").  During the Sep. 2023 Call, defendant Tiejema told investors and analysts that part of Masonite's "capital allocation strategy" included "*using share repurchase as our form of distributing capital back to the investor base*."   Masonite's common stock price closed at $94.99 per share on September 19, 2023.

47.     According to defendant Tiejema, Defendants were using share repurchases to "distribut[e] capital back" to investors.  Unbeknownst to investors, however, Defendants knew, but failed to disclose, that Masonite had received the Second OC Proposal, offering to pay $128.00 per share of Masonite common stock.  Thus, under the guise of "distributing capital back to the investor base[,]" Defendants were repurchasing shares from investors for far less than the Second OC Proposal.

48.     Then, on September 25, 2023, after nearly two months of due diligence, Owens Corning delivered a letter to Masonite memorializing a proposal to acquire all outstanding shares of Masonite for $132.00 in cash per share (the "Third OC Proposal").  The closing price of Masonite common stock on September 22, 2023 was $93.09 per share.  The letter also stated that Owens Corning had only limited confirmatory due diligence outstanding and was ready to progress quickly towards entering into a definitive transaction agreement no later than Masonite's third quarter of 2023 earnings announcement, estimated to be during the week of November 6, 2023.  The Board was made aware of the Third OC Proposal that same day.

49.     On October 2, 2023, the Board held a meeting with members of Masonite's senior management, as well as representatives of Wachtell Lipton and Goldman Sachs.  During the meeting, the Board determined that the Third OC Proposal continued to undervalue Masonite, and turned down the Third OC Proposal.  The Board, however, decided that management should communicate to Owens Corning that the Board would consider engaging in a transaction at a purchase price of ***no less than $140.00 per share***.  Masonite's common stock price closed at $92.93 on October 2, 2023.

50.    The next day, on October 3, 2023, defendant Heckes contacted Chambers and informed him of the Board's decision.  Defendant Heckes also relayed the Board's message that Masonite would consider a transaction at a purchase price of no less than $140.00 per share.

51.    Between October 5, 2023 and November 7, 2023, Masonite provided additional financial modeling to Owens Corning, and met with Owens Corning senior management to discuss Masonite's financial outlook in the coming years.

52.    Also during this period, on October 25, 2023, at Masonite's direction, Jefferies LLC ("Jefferies"), another financial advisor of Masonite not yet engaged in connection with the Owens Corning negotiations, informed PGTI through its financial advisor that Masonite was interested in making a mixed cash-and-stock bid to acquire PGTI.

53.    On October 27, 2023, Masonite and PGTI entered into a confidentiality agreement including a nine-month standstill period.  Thus, in the midst of escalating discussions regarding a potential transaction with Owens Corning, Masonite was also contemplating acquiring PGTI. Despite the fact that Masonite was now involved in two separate business combination negotiations, Defendants refused to reveal this information to its investors.

54.    On November 7, 2023, after the market closed, Masonite announced its financial results for the quarter ended October 1, 2023 ("3Q23").  Before the market opened on November 8, 2023, Masonite hosted an earnings call with analysts and shareholders to discuss the Company's 3Q23 financial results (the "Nov. 2023 Call").  During the Nov. 2023 Call, defendant Tiejema told analysts and investors that "*[d]uring the third quarter, Masonite repurchased approximately 106,000 shares of stock for $10 million at an average price of $94.05*."  Defendant Tiejema made no mention of Owens Corning's offers, nor that the Board was willing to consider a transaction with Owens Corning at a purchase price of no less than $140.00 in cash per share.

55.    According to the Company's Form 10-Q for 3Q23, dated November 8, 2023 (the "3Q23 Form 10-Q"), which was signed by defendant Tiejema, all of Masonite's 3Q23 repurchases were made between August 28, 2023 and October 1, 2023, meaning after Masonite had received the Second OC Proposal (for $128.00 cash per share) on July 13, 2023, and during the same time Masonite received the Third OC Proposal (for $132.00 cash per share) on September 25, 2023. Unbeknownst to investors, Masonite made these purchases, at an average price of $94.05, with knowledge that Owens Corning was willing to pay *at least* 36% to 40% more for those shares. While Defendants rejected the Second OC Proposal and Third OC Proposal, they continued to engage with Owens Corning in hopes of receiving a better offer.

56.    Masonite's 3Q23 Form 10-Q, stated the following regarding Masonite's share repurchase program:

> Under this program, the Company may repurchase shares from time to time, depending on market conditions and alternate uses of capital. The timing and actual number of shares repurchased will depend on a variety of factors, including price, general business and market conditions and alternate uses of capital. The share repurchase program may be effected through Rule 10b5-1 plans, open market purchases, *each in compliance with Rule 10b-18 under the Exchange Act*, or privately negotiated transactions.

57.    The statement quote above that Masonite's share repurchases complied with Rule 10b-18 remained current on the market as Masonite's most recent statement on this subject until the filing of Masonite's Form 10-K in February 2024. Rule 10b-18 confers no immunity from possible Rule 10b-5 liability where the issuer engages in the repurchases while in possession of material, nonpublic information concerning its securities, or where purchases are part of a plan or scheme to evade the federal securities laws. This statement became actionable and materially false and misleading when Masonite repurchased stock in June 2023 and subsequent months while aware of material nonpublic information concerning the First OC Proposal and Owens Corning's continuous

interest in acquiring Masonite for a premium over its stock's market price. At that time, Masonite and the Individual Defendants came under an obligation to either disclose the material nonpublic information about the Third OC Proposal or abstain from trading Masonite stock. Accordingly, Defendants had an obligation to update the statement quoted above, but failed to do so and instead continued to repurchase Masonite stock in violation of Section 10(b), Rule 10b-5, and Rule 10b5-1.

58.    On November 14, 2023, in the midst of its negotiations with Owens Corning, Masonite submitted a written proposal to acquire PGTI for $37.00 per share of PGTI common stock, comprised of $30.96 per share in cash and $6.04 per share in Masonite common shares. PGTI rejected this offer, and noted the offer would have to be at least $40.00 per share in order for PGTI to be willing to open negotiations with Masonite.

59.    On November 16, 2023, Masonite submitted yet another written offer to acquire PGTI, this time for $38.50 per share of PGTI common stock, comprised of $31.93 in cash and $6.57 in Masonite common shares. In its offer, Masonite further stated that it would deliver definitive financing commitment papers at signing and that the proposed transaction would not be subject to a financing contingency. Defendant Heckes and Jeff Jackson ("Jackson"), PGTI's CEO, held a call on November 16, 2023, and Jackson reiterated that PGTI expected an offer of at least $40.00 per share and that he needed to hear back by the end of day on November 17, 2023.

60.    On November 17, 2023, the Board held a meeting with members of Masonite's senior management, including defendant Heckes, as well as representatives from Wachtell Lipton and Jefferies. During the meeting, the Board discussed the proposed acquisition of PGTI.

61.    Later that day, Masonite submitted a revised non-binding written offer to acquire PGTI for $40.00 per share of PGTI common stock, comprised of $33.50 in cash and $6.50 in

Masonite common shares.  Defendants, now in serious negotiations regarding two distinct potential business combinations, continued to keep investors in the dark regarding *both* potential transactions.

62.    On November 20, 2023, defendant Heckes and Chambers met in Tampa, Florida, and Chambers delivered a letter containing a revised proposal to acquire all of the outstanding Masonite common shares for $120.00 in cash per share (the "Fourth OC Proposal").  According to Chambers, the reduced purchase price reflected Masonite's reduced projected 2024 adjusted EBITDA, headwinds in the end markets for Masonite products, expected volume share loss, reduced expected EBITDA margins in the short term, investor reaction to Masonite's recent Investor Day (the Sep. 2023 Call), analyst consensus regarding Masonite's share price, and other macro headwinds.

63.    On November 21, 2023, the Board held a meeting by videoconference with members of Masonite's senior management and Wachtell Lipton.  During the meeting, defendant Heckes provided the Board with an update regarding the Fourth OC Proposal and explained the reasoning Chambers conveyed the prior day regarding the revised purchase price reflected in the Fourth OC Proposal.  After discussion, the Board determined, in light of Owens Corning's reduced offer price and Masonite's potential transaction with PGTI, not to engage in further discussions with Owens Corning and to pursue the acquisition of PGTI.

64.    Also on November 21, 2023, Masonite entered into an exclusivity agreement with PGTI.  Between November 22, 2023 and December 17, 2023, Masonite and PGTI negotiated the material terms of the proposed transaction and engaged in due diligence.

65.    On December 17, 2023, Masonite and PGTI exchanged revised drafts of the merger agreement, and ultimately agreed that the merger agreement would reflect total consideration of $41.00 per share of PGTI common stock, comprised of $33.50 in cash and $7.50 in Masonite common stock.

- 18 -

66.     On the night of December 17, 2023, the Board convened for a meeting and unanimously approved the transaction with PGTI.  Masonite, its merger subsidiary, and PGTI executed the merger agreement that night.

67.     On December 18, 2023, prior to market open, Masonite announced its entry into a definitive agreement relating to the PGTI transaction, pursuant to which PGTI shareholders would receive $41.00 per each PGTI share they own, comprised of $33.50 in cash and $7.50 in Masonite common shares, for a total transaction value of about $3.0 billion.  According to defendant Heckes in a press release filed with the SEC on Form 8-K on December 18, 2023, "[t]he combined business will be well positioned to provide homeowners with differentiated solutions across both the interior and exterior openings of the home, while significantly expanding our geographic presence and growth opportunities."

68.     On January 2, 2024, PGTI announced that MITER Brands provided to PGTI an unsolicited proposal to acquire PGTI for $41.50 per each PGTI share.

69.     On January 3, 2024, Chambers called defendant Heckes to reiterate Owens Corning's continued interest in pursuing an acquisition of Masonite.  Later that same day, Owens Corning delivered another letter to Masonite proposing to acquire all of the outstanding Masonite common shares for $132.00 in cash per share should the transaction with PGTI be terminated (the "Fifth OC Proposal").  The Fifth OC Proposal was made available to the Board that day.

70.     On or about January 4, 2024, Masonite's management informed Jefferies of the Fifth OC Proposal and Owens Corning's prior proposals in order for Jefferies to assist Masonite on potential next steps for both the potential acquisition of PGTI and the potential transaction with Owens Corning.  Masonite subsequently entered into a formal engagement letter with Jefferies in connection with the potential transaction with Owens Corning.  Even with the PGTI deal hanging in

the balance, and Masonite's renewed interest in a transaction with Owens Corning, Defendants said nothing to investors.

71.     On January 13, 2024, the Board held a meeting by videoconference with members of Masonite's senior management and representatives of Wachtell Lipton, Goldman Sachs and Jefferies.  During the meeting, defendant Heckes and the Board reviewed the terms proposed in the Fifth OC Proposal, including in the context of the status of the pending transaction with PGTI. Defendant Heckes noted that while the potential acquisition of PGTI was pending, the Board was unable to accept the Fifth OC Proposal given that the terms of the Fifth OC Proposal assumed termination of the transaction to acquire PGTI.  Also during the meeting, Goldman Sachs told the Board that, following discussions with Owens Corning's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley"), Owens Corning and Morgan Stanley believed due diligence and negotiation of a definitive transaction agreements could be completed within seven to ten days.

72.     Additionally, during the meeting on January 13, 2024, although there was no ability to enter into a transaction with Owens Corning while the PGTI deal was pending, the Board instructed Masonite's management and representatives of Goldman Sachs to update the financial analyses utilizing Masonite's management's current financial projections for purposes of presenting such financial analyses to the Board at the following meeting in connection with its consideration of a potential response to Owens Corning.  The Board also determined that, if the PGTI deal were terminated, the risks of contacting other parties to gauge their interest in a potential transaction with Masonite outweighed the potential benefits of such outreach at such time.  Thus, Defendants had solidified their plan to reengage with Owens Corning *exclusively* in the event they determined not to offer a revised proposal to PGTI.

73.     On January 17, 2024, Masonite announced the termination of the PGTI deal after the Board decided not to offer a revised proposal in response to MITER Brands' bid to purchase PGTI. Upon termination of the deal with PGTI, Masonite received a breakup fee of $84 million.  Later that day, MITER Brands and PGTI announced they entered into a definitive merger agreement for MITER Brands to acquire all outstanding shares of PGTI at a price of $42.00 per share in cash, with a total transaction value of about $3.1 billion.  Defendants again failed to inform investors about its discussions with Owens Corning, even now that the PGTI transaction was officially terminated.

74.     After the PGTI acquisition unraveled, Defendants quickly pivoted back to Owens Corning and the Fifth OC Proposal.  Later on January 17, 2024, the Board held a meeting by videoconference with members of Masonite's senior management and representatives of Wachtell Lipton, Goldman Sachs and Jefferies.  During the meeting, the Board reviewed updated financial projection for the Company.  After discussion, the Board directed Masonite's management to inform Owens Corning that Masonite was willing to engage in a confirmatory due diligence process and negotiation of definitive transaction documents, with the understanding that further negotiation of price and terms would be required.  Masonite's common stock price closed at $90.93 per share on January 17, 2024.

75.     On January 22, 2024, representatives of Davis Polk & Wardwell LLP ("Davis Polk"), Owens Corning's legal advisor, provided a draft arrangement agreement to representatives of Wachtell Lipton.

76.     Between January 17 and 31, 2024, representatives of Masonite, Wachtell Lipton, and Goldman Sachs had numerous conversations with representatives of Owens Corning and its advisors expressing that $132.00 in cash per share would not be a sufficient price for the Board to approve a

transaction with Owens Corning.  During this period, Masonite's common stock price never closed above $93.35 per share.

77.    On January 25 and 26, 2024, representatives of Owens Corning conducted in-person site visits at Masonite's sites in: (i) Pittsburg, Kansas; (ii) Laurel, Mississippi; and (iii) Mesquite, Texas.  On January 28, 2024, representatives of Wachtell Lipton provided a mark-up of the draft arrangement agreement to representatives of Davis Polk.  On January 29 and 30, 2024, representatives of Masonite had due diligence calls with representatives of Owens Corning and, during the months of January and February 2024, representatives of Masonite continued to respond to written due diligence requests from representatives of Owens Corning.  Even as negotiations and due diligence with Owens Corning escalated, Defendants still refused to inform investors about a potential transaction with Owens Corning.

78.    Then, on January 31, 2024, representatives of Davis Polk provided a revised draft arrangement agreement to representatives of Wachtell Lipton.  On the same day, Chambers informed defendant Heckes that Owens Corning would increase its proposal to $133.00 in cash per share (the "Final OC Proposal"), subject to certain terms.  On January 31, 2024, Masonite's common stock closed at $92.05 per share.

79.    On February 1, 2024, the Board held a meeting by videoconference with members of Masonite's senior management and representatives of Wachtell Lipton, Goldman Sachs and Jefferies. During the meeting, defendant Heckes informed the Board of the Final OC Proposal.

80.    On February 4, 2024, the Board held a meeting by videoconference with members of Masonite's senior management and representatives of Wachtell Lipton, Goldman Sachs and Jefferies.  During the meeting, defendant Heckes provided an update to the Board regarding the remaining open matters in the due diligence and negotiation process with Owens Corning.

Additionally, representatives from Wachtell Lipton provided an update on the key terms of the arrangement agreement. Defendant Heckes then provided the Board with an update regarding the communication and roll out plan in connection with an announcement of the potential transaction with Owens Corning. After nearly eight months of negotiations following the First OC Proposal, Defendants still had not apprised investors of the potential transaction.

81.    On February 8, 2024, the Board held a meeting by videoconference with members of Masonite's senior management and representatives of Wachtell Lipton, Goldman Sachs and Jefferies. During the meeting, the Board determined that the Final OC Proposal was in the best interest of Masonite. Later that day, Masonite, Owens Corning, and Owens Corning's subsidiary MT Acquisition Co ULC executed an arrangement agreement memorializing the acquisition of Masonite.

82.    On February 9, 2024, prior to market open, Masonite issued a press release announcing the execution of the arrangement agreement. Finally, eight months after receiving the First OC Proposal, Defendants apprised investors that Owens Corning was willing to pay a significant premium over the market price for Masonite common stock. On this news, Masonite's common stock price skyrocketed to $130.51 at market close on February 9, 2024, a 35.1% increase over the closing price on the prior trading day.

83.    After the Class Period, on February 29, 2024, Masonite filed on Form 10-K its financial results for fiscal year 2023 (the "2023 Form 10-K"), which was signed by defendants Heckes and Tiejema. In the 2023 Form 10-K, Masonite disclosed that, in the quarter ended December 31, 2023 ("4Q23"), it had repurchased 83,528 shares of Masonite common stock at an average price of $88.88, for a total of approximately $7.4 million dollars.

84.    The 2023 Form 10-K included Masonite's share repurchases in 4Q23 by month, depicted below:

| Date | Total Number of Shares Purchased | Average Price Paid per Share |
|---|---|---|
| October 2, 2023 through October 29, 2023 | N/A | N/A |
| October 30, 2023 through November 26, 2023 | 30,002 | $86.20 |
| November 27, 2023 through December 31, 2023 | 53,526 | $90.38 |
| **Total** | **83,528** | **$88.88** |

85.    Between October 30, 2023 and December 31, 2023, Defendants had already received the Third OC Proposal (for $132.00 cash per share) on September 25, 2023, and also received the Fourth OC Proposal (for $120.00 cash per share) on November 20, 2023 during this window. Despite knowing that Owens Corning was willing to pay between 35%-48.5% more than the average $88.88 price per share Masonite was paying to its shareholders, Defendants refused to disclose this information to investors in order to keep Masonite's common stock price artificially deflated.

## DEFENDANTS ACTED WITH SCIENTER

86.    Masonite and the Individual Defendants acted with scienter because Defendants had actual knowledge of the material undisclosed facts concerning Owens Corning's credible offer(s) to acquire Masonite shares at materially higher prices that rendered their public statements materially false and misleading.

87.    Defendants were aware of the details and timing of Owens Corning's offers.  Owens Corning communicated its offers to the highest executive level of Masonite – delivering its offers directly to defendant Heckes – and its offers were discussed at multiple Board meetings, which were attended by defendants Heckes and Tiejema.

88.    Defendants were aware of Masonite's repurchases of millions of dollars of its own stock.  Among other things, Defendants disclosed these repurchases in the 2Q23 Form 10-Q, the 3Q23 Form 10-Q, and the 2023 Form 10-K, filed in August 2023, November 2023, and February 2024, respectively.  Defendants Heckes and Tiejema signed these filings and certified their completeness and accuracy.  Moreover, Masonite's disclosures about the repurchases stated that "the Company may repurchase shares from time to time, depending on market conditions and alternate uses of capital.  The timing and actual number of shares repurchased will depend on a variety of factors, including price, general business and market conditions and alternate uses of capital." Defendant Tiejema spoke about the repurchases at Masonite's Investor Day (the Sep. 2023 Call) and on earnings calls.

89.    Defendants were aware of the market price of Masonite's stock and were therefore aware that Owens Corning's offers were at prices materially above the market price, as well as that Masonite's repurchases were at prices materially below Owens Corning's offers.  Defendants were also aware that, even if they rejected an offer, Owens Corning could return with an improved offer.

90.    The magnitude of pace of Masonite's stock repurchases during the Class Period also support a strong inference of scienter.  Masonite repurchased approximately $25 million worth of stock during the Class Period.

91.    In addition to Defendants' actual awareness of the undisclosed material facts, the inference of scienter is enhanced further by the financial motive Defendants had for Masonite to repurchase millions of its shares at prices artificially deflated by Defendants' failure to disclose Owens Corning's offer to acquire those shares at materially higher prices.  Further, by repurchasing shares without disclosing Owens Corning's offer, Defendants propped up their negotiating position in responding to acquisition offers by Owens Corning when Owens Corning's offer became publicly

known and unsolicited bidders would emerge. This strategy would have failed if Defendants had disclosed Owens Corning's offer before conducting the repurchases, because the stock price would have increased and Defendants would have been unable to buy stock opportunistically on the cheap, as they said they intended to do. Thus, Owens Corning's offer and Defendants' awareness that the Company was presented with a material acquisition proposal gave Defendants an additional motive to repurchase stock without disclosing the offer.

## LOSS CAUSATION AND ECONOMIC LOSS

92.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially deflated the prices of Masonite common stock and operated as a fraud or deceit on sellers of Masonite common stock. As detailed above, when the truth about Defendants' misconduct and omissions concerning Owens Corning's offers to purchase the company was revealed, the price of Masonite common stock increased precipitously as the prior artificial deflation came out. The increase in the price of Masonite common stock was the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the share price increase negates any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially deflate the prices of Masonite common stock and the subsequent significant increase in the value of Masonite common stock when Defendants' prior misrepresentations, omissions, and other fraudulent conduct were revealed.

93.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiff and other

Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Masonite's business, operations, and financial prospects as alleged herein.  Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of Masonite common stock to be artificially deflated.  Plaintiff and other Class members sold Masonite common stock at those artificially deflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

94.    Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

95.    Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Masonite common stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a)    Masonite common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

(b)    Masonite regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)    Masonite was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of

their respective brokerage firms. These reports were publicly available and entered the public marketplace.

96.     As a result of the foregoing, the market for Masonite common stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all those who transacted in Masonite common stock during the Class Period suffered similar injury through their transactions in Masonite common stock at artificially deflated prices and a presumption of reliance applies.

97.     Without knowledge of the misrepresented or omitted material facts, Plaintiff and other Class members sold Masonite common stock between the time Defendants omitted, misrepresented, and failed to disclose material facts and the time the true facts were disclosed. Accordingly, Plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for Masonite common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## CLASS ACTION ALLEGATIONS

98.     Plaintiff brings this action on behalf of all sellers of Masonite common stock during the Class Period who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company ("Excluded D&Os"), the Defendants' and the Excluded D&Os' immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants or Excluded D&Os have or had a controlling interest.

99.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Masonite common stock was actively traded on the

NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Masonite or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon information and belief, these shares were held by hundreds or thousands of individuals located geographically throughout the country. Joinder would be highly impracticable.

100.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws complained of herein.

101.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

102.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether Defendants omitted or misrepresented material facts;

(c)    whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements and/or omissions;

(d)    whether the prices of Masonite common stock during the Class Period were artificially deflated because of Defendants' conduct complained of herein; and

- 29 -

(e)    whether the members of the Class have sustained damages and, if so, the proper measure of damages.

103.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Treatment as a class will permit a large number of similarly situated person to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication effort or expense that numerous individual actions would require.

104.    Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

105.    No difficulties are likely to be encountered in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

106.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

107.    During the Class Period, Defendants had access to the material, nonpublic confidential information concerning the Company and its true prospects alleged herein at ¶¶28-85.

108.    Notwithstanding their duty to refrain from trading in Masonite common stock unless they disclosed those material, nonpublic, favorable facts alleged herein, and in violation of their

fiduciary duties to Plaintiff and other members of the Class, Defendants caused Masonite to purchase more than two million shares of Masonite common stock at artificially deflated prices.

109.    The magnitude of the proposed transaction, the credibility of the bid by a company of Owens Corning's stature, and the degree of interest shown by Owens Corning, in total, illustrate that the Owens Corning's offer would have been material and significant to a reasonable investor in making their investment decision.

110.    Defendants caused Masonite to purchase those shares of common stock, as alleged above, at market prices artificially deflated by the nondisclosure of material, nonpublic, favorable facts during the Class Period.

111.    Defendants knew that they were in possession of material, nonpublic, favorable information that was not known to the investing public, including Plaintiff and other members of the Class.  Before purchasing that common stock from the public, Defendants were obligated to disclose that material, nonpublic favorable information to Plaintiff and other members of the Class.

112.    By reason of the foregoing, Defendants, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of the national securities exchanges, employed devices, schemes, and artifices to defraud, and engaged in acts and transactions and a course of business which operated as a fraud or deceit upon members of the investing public who sold Masonite common stock during the Class Period.

113.    Plaintiff and other members of the Class who sold shares of Masonite common stock: (i) have suffered substantial damages because they relied upon the integrity of the market and sold shares of Masonite common stock at artificially deflated prices as a result of the violations of §10(b) and Rule 10b-5 alleged herein; and (ii) would not have sold Masonite common stock at the prices they sold at, or at all, if they had been aware that the market prices had been artificially and falsely

deflated by Defendants' concealment.  At the time of the sales by Plaintiff and members of the Class, the fair and true value of Masonite common stock was substantially more than the prices at which they sold their shares.

114.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their sales of Masonite common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

115.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

116.    During the Class Period, the Individual Defendants acted as controlling persons of Masonite within the meaning of §20(a) of the 1934 Act.  By virtue of their positions within the Company, and their power to control public statements about Masonite, the Individual Defendants had the power and ability to control the actions of Masonite and its employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

(a)    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)    Awarding Plaintiff and the members of the Class damages and interest;

(c)    Awarding Plaintiff's reasonable costs, including attorneys' fees; and

       (d)     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

       Plaintiff demands a trial by jury.

DATED: February 6, 2026

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARIO ALBA JR.
JONATHAN A. OHLMANN

*/s/ Mario Alba Jr.*

MARIO ALBA JR.

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
malba@rgrdlaw.com
johlmann@rgrdlaw.com

WOLF POPPER LLP
ROBERT C. FINKEL
JOSHUA W. RUTHIZER
ADAM SAVETT
845 Third Avenue, 12th Floor
New York, NY 10022
Telephone: 212/759-4600
rfinkel@wolfpopper.com
jruthizer@wolfpopper.com
asavett@wolfpopper.com

*Counsel for Plaintiff*