UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re MASONITE INTERNATIONAL CORPORATION SECURITIES LITIGATION | Civil Action No. 1:26-cv-01052-AT |
| | CLASS ACTION |
| | AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ....................1

JURISDICTION AND VENUE ....................6

PARTIES ....................7

Plaintiff ....................7

Defendants ....................7

RELEVANT NON-PARTIES ....................9

SUBSTANTIVE ALLEGATIONS ....................9

Masonite's Stock Repurchase Plans ....................10

Relevant Pre-Class Period Events....................11

Owens Corning's First and Second Acquisition Offers, Defendants' Internal Discussions, and the Creation of the "Advisory Group" ....................11

Defendants Begin Sharing Strategic and Financial Information with Owens Corning ....................14

Defendants Conceal Owens Corning's Repeated Acquisition Offers and Repurchase Shares Until the End of the Class Period ....................16

DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS....................32

Defendants Violated Their Duty to Disclose Owens Corning's Credible Acquisition Offers or Abstain from Trading in Masonite Securities....................32

Defendants' Statements Concerning the Share Repurchases Were Materially False and Misleading When Made ....................34

Defendants' Statements Concerning the 2022 Program's Compliance with Rule 10b-18 Were Materially False and Misleading When Made ....................38

Defendants' SOX Certifications Were Materially False and Misleading When Made ....................43

Defendants' Statements Leading Up to and Following the Termination of the PGTI Deal Were Materially False and Misleading When Made....................44

ADDITIONAL SCIENTER ALLEGATIONS....................47

**Page**

LOSS CAUSATION AND ECONOMIC LOSS ....... 50

NO SAFE HARBOR ....... 52

APPLICABILITY OF PRESUMPTION OF RELIANCE ....... 52

CLASS ACTION ALLEGATIONS ....... 54

COUNT I ....... 56

For Violation of §10(b) of the 1934 Act and Rule 10b-5(b) Against All Defendants ....... 56

COUNT II ....... 57

For Violation of §10(b) of the 1934 Act and Rule 10b-5(a), (c) Against All Defendants ....... 57

COUNT III ....... 60

For Violation of §20(a) of the 1934 Act Against the Individual Defendants ....... 60

PRAYER FOR RELIEF ....... 60

JURY DEMAND ....... 61

Lead Plaintiff Central Illinois Carpenters Health & Welfare Trust Fund ("Lead Plaintiff"), on behalf of itself and all others similarly situated, by Lead Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Lead Counsel, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings by Masonite International Corporation ("Masonite" or the "Company"), conference call transcripts, Company press releases, wire and press releases, and media and analyst reports about the Company, as well as publicly available information about Owens Corning. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all sellers of the common stock of Masonite between June 5, 2023 and February 8, 2024, inclusive (the "Class Period"), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act" or "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, against Masonite and certain of the Company's senior officers and directors during the Class Period ("Defendants," defined fully below).

2. This action arises from Defendants' material omissions and misrepresentations concerning Owens Corning's repeated offers to purchase all of Masonite's outstanding common stock at significant premiums to the Company's stock price and Defendants' fraudulent scheme to repurchase millions of dollars' worth of Masonite common stock without disclosing material nonpublic information about Owens Corning's offers, which, if disclosed as required, would have indicated to investors that Masonite's stock was worth significantly more.

3. The Class Period begins on June 5, 2023. On that date, Owens Corning approached Masonite with a credible offer to acquire all of the Company's outstanding stock for $120.00 cash per share – a significant cash premium over Masonite's then-current stock price of $94.09 per share. Confirming the seriousness of Owens Corning's offer, Masonite's Board of Directors (the "Board") created an "Advisory Group" of certain directors and senior management, including then CEO defendant Heckes (defined below), which would, among other things: (i) consider retention of experienced financial advisors; (ii) analyze the proposal; and (iii) prepare materials and analysis to assist the Board in evaluating and responding to the proposal. The Board eventually engaged Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton") and Goldman Sachs & Co. LLC ("Goldman Sachs") for legal and financial advice. While Defendants were evaluating and seriously considering the first credible offer from Owens Corning, Masonite repurchased over 79,000 shares of its own shares in just one month at an average price of $90.15 per share.

4. Although Masonite declined the first offer, Defendants continued to engage with Owens Corning, which was determined to acquire the Company and returned with repeated offers at significant premiums to Masonite stock's market price. In July 2023, following a second credible offer from Owens Corning, the Board agreed to begin sharing proprietary strategic and financial information with Owens Corning, and Masonite and Owens Corning subsequently entered into a confidentiality agreement. No later than August 2023, Masonite began sharing proprietary strategic and financial information with Owens Corning in an effort to receive better offers. At multiple times during the Class Period, Owens Corning made clear to Defendants that it was willing to move quickly towards entering into a definitive agreement. These negotiations spanned eight months, and included, *inter alia*: (i) six offers from Owens Corning (beginning at $120.00 per share and ending at $133.00 per share), (ii) the use of top-tier outside financial and legal advisors and the creation of an

internal, high-level Advisory Group to evaluate and vet the offers, (iii) a confidentiality agreement between Owens Corning and Masonite, and (iv) the sharing of strategic and financial information. The negotiations culminated in Owens Corning's acquisition of Masonite at a significant premium in February 2024. The market reaction to the acquisition announcement was a startling 35% one-day increase in the price of Masonite common stock, with over five million shares traded.

5. Defendants violated §10(b) and Rule 10b-5 by failing to either abstain from trading in Masonite's stock or disclose Owens Corning's offers while buying back Masonite's stock. The magnitude of the proposed transaction, the credibility of the bids by a strategic acquirer of Owens Corning's stature, and the degree of interest shown by Owens Corning – including repeated representations that Owens Corning was willing to move quickly towards entering into a definitive agreement – in total, illustrate that the Owens Corning's offers would have been material and significant to a reasonable investor in making their investment decision regarding Masonite.

6. Defendants' violations and fraudulent scheme continued throughout the Class Period, as they failed to disclose Owens Corning's subsequent acquisition offers, as well as negotiations and due diligence by and between Masonite and Owens Corning. In total, Owens Corning made six offers to acquire Masonite: (i) on June 5, 2023, for $120.00 cash per share; (ii) on July 13, 2023, for $128.00 cash per share; (iii) on September 25, 2023, for $132.00 cash per share; (iv) on November 20, 2023, for $120.00 cash per share; (v) on January 3, 2024, for $132.00 cash per share; and (vi) on January 31, 2024, for $133.00 cash per share. Defendants seriously considered each proposal and continued to engage with Owens Corning even after rejecting a proposal, in the hopes of receiving an improved offer. Contemporaneous with most of these credible offers from Owens Corning, Defendants continued to repurchase Masonite shares throughout the Class Period. Specifically, as reported in the Company's SEC filings, Masonite repurchased: (i) approximately 79,000 shares for

an average price of $90.15 per share during the final month of the second quarter of 2023; (ii) approximately 106,000 shares for an average price of $94.05 per share during the third quarter of 2023; and (iii) approximately 83,000 shares for an average price of $88.88 per share during the fourth quarter of 2023, despite knowing that Owens Corning was offering a significant premium to Masonite's then-current stock price. Defendants knew that the disclosure of Owens Corning's offers and Masonite's desire for improved bids would likely increase Masonite's stock price and make continued repurchases materially more expensive.

7. During this same time, beginning in November 2023, Masonite began making formal offers to acquire PGTI (defined fully below). During these negotiations, Masonite similarly kept investors entirely in the dark, even as those negotiations escalated. On December 18, 2023, Masonite and PGTI announced they had entered into a definitive agreement whereby Masonite would acquire all outstanding PGTI common stock for $41.00, comprised of $33.50 in cash and $7.50 in Masonite common shares (the "PGTI Deal").

8. However, on January 2, 2024, PGTI announced that MITER Brands had provided to PGTI an unsolicited proposal to acquire PGTI for $41.50 per PGTI share. On this news, Defendants scrambled back to Owens Corning, reengaging in negotiations for a potential sale and promptly receiving another offer from Owens Corning. Importantly, Owens Corning's offer following MITER Brands' unsolicited bid was ***contingent on the termination of the PGTI Deal***. Despite these renewed negotiations, Defendants, using Deutsche Bank Research as a conduit, disseminated false and misleading information to investors that reassured them of their commitment to the PGTI Deal.

9. Defendants, however, announced on January 17, 2024 that they decided not to match or exceed the unsolicited offer from MITER Brands. Instead, Defendants fixated on the potential

transaction with Owens Corning and agreed internally to engage ***exclusively*** with Owens Corning. Despite their preoccupation with pursuing a sale to Owens Corning, Defendants, on January 17, 2024, misled investors once again by announcing that Masonite "remain[ed] focused" on operating its business – even with an imminent sale looming. Defendants, however, were anything but focused on maintaining the status quo. Indeed, unbeknownst to shareholders, the very same day as Defendants' assurances to the market, the Board directed Masonite's management to inform Owens Corning that Masonite was willing to engage in a confirmatory due diligence process and negotiation of definitive transaction documents.

10. After playing both sides, *i.e.*, exploring a sale to Owens Corning and the acquisition of PGTI, on February 9, 2024, Masonite announced that it successfully negotiated a sale of the Company to Owens Corning for $133.00 per share – "***an all time high stock price***"[1] for Masonite.

11. During the Class Period, Masonite made no disclosure concerning Owens Corning's offers for approximately eight months, while the Company repurchased millions of dollars of its own shares at prices far below Owens Corning's offers. Accordingly, the market was blindsided by Masonite's acquisition announcement, calling the Owens Corning acquisition "***a surprise***" and noting it was "***expected [that] the company [would] regroup and focus on regaining operating momentum in the core residential business***."

12. In total, Masonite repurchased nearly 270,000 of its outstanding shares from unsuspecting investors for approximately $25 million during the Class Period, despite actual knowledge that Owens Corning was continuously proposing offers at a significant premium to Masonite's then-current stock price and Defendants were engaged in serious negotiations with Owens Corning. At the same time, Defendants made numerous false and misleading statements

---

[1] All emphasis in quotations in this Complaint is added, except as otherwise noted.

touting this significant repurchase activity, repeatedly updating investors about these buybacks during the Class Period and telling investors the buybacks were meant to "***distribut[e] capital back to the investor base***," all with no disclosure concerning Owens Corning's credible offers to acquire Masonite shares at significantly higher prices. Masonite also affirmatively represented to investors that its repurchases complied with Rule 10b-18, which forbids repurchases while aware of material nonpublic information. Moreover, Defendants filed with the SEC materially false and misleading Sarbanes-Oxley Act of 2002 ("SOX") certifications attesting to the veracity and completeness of Masonite's quarterly earnings results. Finally, Defendants made and disseminated materially false and misleading statements regarding the Company's strategic and operational plans leading up to and following the failed attempt to acquire PGTI. As a result, Masonite omitted material information about Owens Corning's offers that the Company had a duty to disclose, and Defendants made material misrepresentations and omissions about Masonite's repurchases and operational strategy, in violation of the federal securities laws.

13. When investors learned the truth that Owens Corning was willing to buy all of the Company's outstanding stock for a significant premium above the trading price, Masonite's stock price climbed sharply.

14. This action seeks damages on behalf of sellers of Masonite stock during the Class Period who were harmed as a result of these violations of the federal securities laws by Defendants.

**JURISDICTION AND VENUE**

15. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

17. Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in this District.

18. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE"). During the Class Period, Masonite common stock traded on the NYSE under the ticker symbol "DOOR."

## PARTIES

### Plaintiff

19. Lead Plaintiff Central Illinois Carpenters Health & Welfare Trust Fund, as set forth in the certification previously filed with the Court and incorporated by reference herein, sold Masonite common stock during the Class Period and was damaged thereby. ECF No. 1-1.

### Defendants

20. Defendant Masonite is a British Columbia corporation with its corporate headquarters located at 1001 East Palm Avenue, Tampa, Florida 33605. Masonite is a leading global designer, manufacturer, marketer, and distributor of interior and exterior doors and door solutions for the residential and non-residential building construction markets' new construction and repair, renovation and remodeling sectors. Following its acquisition by Owens Corning in May 2024, Masonite has operated as Owens Corning's Doors business unit. During the Class Period, Masonite common stock traded in an efficient market on the NYSE. As of February 27, 2024, Masonite had approximately 22 million shares of common stock outstanding.

21. Defendant Howard C. Heckes ("Heckes") was, at all relevant times, President, CEO, and a member of the Board.

22. Defendant Russell T. Tiejema ("Tiejema") was, at all relevant times, Executive Vice President and CFO at Masonite.

23. Defendants Heckes and Tiejema were senior executives of Masonite and are sometimes referred to herein as the "Individual Defendants."

24. Masonite, Heckes, and Tiejema are collectively referred to herein as "Defendants."

25. Defendants are liable for: (i) making false and misleading statements; and (ii) failing to disclose nonpublic facts known to them about Masonite and the true market value of its common stock. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on sellers of Masonite common stock was a success, as it: (i) deceived the investing public regarding Masonite's prospects; (ii) artificially deflated the market price of Masonite common stock; and (iii) caused Lead Plaintiff and other members of the Class (defined herein) to sell Masonite common stock at artificially deflated prices.

26. The Individual Defendants made, or caused to be made, materially false and misleading statements and omissions of material fact that caused Masonite's common stock to trade at artificially depressed or deflated levels during the Class Period. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of, and had the ability and opportunity to prevent the issuance or cause the correction of, Masonite's public statements, as alleged in this Complaint. Because of their positions with the Company and their access to material nonpublic information available to them but not to the public, the Individual Defendants knew that the facts specified in this Complaint had not been disclosed to and were being concealed from the market, and that Masonite's representations were materially false and misleading at the time they were made. The Individual Defendants are liable for the material omissions and false and misleading statements pled in this Complaint.

## RELEVANT NON-PARTIES

27. Owens Corning is a Delaware corporation with its corporate headquarters located at One Owens Corning Parkway, Toledo, Ohio 43659. Owens Corning is a residential and commercial building products company focusing primarily on roofing products and systems, insulation projects, door and door systems, and fiberglass composites. On May 15, 2024, Owens Corning acquired all outstanding common stock of Masonite.

28. Brian Chambers ("Chambers") has served as Owens Corning's CEO since 2019 and Chair of Owens Corning's Board of Directors since 2020.

29. PGT Innovations, Inc. ("PGTI"), a Delaware corporation with its corporate headquarters located at 1070 Technology Drive, North Venice, Florida 34275, is a manufacturer of aluminum and vinyl-framed windows and doors, as well as overhead garage doors. Since March 28, 2024, PGTI has been owned and operated by MITER Brands.

## SUBSTANTIVE ALLEGATIONS

30. This case involves material misrepresentations, omissions, and a scheme by Defendants to defraud Masonite's public investors during the Class Period by repurchasing approximately $25 million worth of Masonite common stock on the open market, while concealing material information that Owens Corning was offering to acquire all outstanding shares of Masonite at a significant premium to the stock's market prices. Defendants materially misled investors through numerous affirmative statements concerning Masonite's repurchases that made no mention of Owens Corning's superior offer, and misrepresented to investors that the repurchases would "distribut[e] capital back" to investors and complied with the federal securities laws, when in fact Defendants were aware of, but failed to disclose, material nonpublic information concerning a credible buyer willing to pay a large premium over the market price. Defendants therefore made materially false and misleading statements and omissions in violation of Rule 10b-5(b), and their

repurchases, misrepresentations about the repurchases, and omissions about Owens Corning's offers together constituted a device, scheme, or artifice to defraud and an act, practice or course of business which operated as a fraud or deceit upon investors in violation of Rule 10b-5(a) and (c).

**Masonite's Stock Repurchase Plans**

31. On February 24, 2016, the Board approved a share repurchase program pursuant to which Masonite could repurchase from time to time up to $150 million of its outstanding common stock. Over the years, the Board approved additional share repurchase plans. On February 21, 2022, the Board approved an incremental $200 million share repurchase program (the "2022 Program"), the fifth such program approved by the Board.

32. Under the 2022 Program, shares could be repurchased from time to time in open market transactions, in privately negotiated transactions, or otherwise, and the timing and the other terms of the repurchase depended on a variety of factors, including legal requirements, economic and market conditions, and other investment opportunities.

33. As detailed further herein, at the time Masonite was discretionarily repurchasing Masonite stock throughout the Class Period, Defendants knew Masonite had received numerous formal acquisition offers from Owens Corning to purchase all outstanding shares of Masonite common stock at prices significantly above the then-current market prices of Masonite common stock, and therefore significantly above the prices at which Masonite was repurchasing Masonite common stock from unsuspecting Class members. Accordingly, Masonite had an obligation to disclose that it had received these formal acquisition offers from Owens Corning or abstain from purchasing Masonite stock from unsuspecting investors. Masonite did not disclose this material information during the Class Period.

**Relevant Pre-Class Period Events**

34. In or about February 2023, Chambers, Owens Corning's CEO, contacted defendant Heckes to offer an introductory meeting in Tampa, Florida. On February 28, 2023, defendant Heckes met with Chambers in Tampa, Florida.

35. On May 10, 2023, Chambers contacted defendant Heckes to schedule a call. Defendant Heckes notified Robert J. Byrne ("Byrne"), then Masonite's Chairman of the Board, of Chamber's request.

36. On May 10 and May 11, 2023, at a regularly scheduled meeting, defendant Heckes briefed the Board on his interactions with Chambers to date.

37. On May 12, 2023, Chambers expressed on a call with defendant Heckes his interest in meeting in person to discuss a potential business combination between Owens Corning and Masonite. Defendant Heckes expressed to Chambers that Masonite was comfortable with its standalone plan and was focused on executing it. Defendant Heckes reported his conversation with Chambers to Byrne.

38. On May 18, 2023, Chambers indicated on a call with defendant Heckes that Owens Corning was interested in a potential transaction with Masonite and asked to meet with him in person to discuss Owens Corning's perspectives on the topic. Defendant Heckes reported this conversation with Chambers to Byrne.

**Owens Corning's First and Second Acquisition Offers, Defendants' Internal Discussions, and the Creation of the "Advisory Group"**

39. The Class Period begins on June 5, 2023 – Masonite's stock opened at $94.09 per share. On that day, defendant Heckes met with Chambers in Tampa, Florida. During the meeting, Chambers expressed interest in pursuing a business combination between Masonite and Owens Corning. Chambers delivered to Masonite a letter memorializing Owens Corning's first offer to

acquire all of the outstanding Masonite common shares for $120.00 cash per share (the "First OC Proposal"). In addition, the letter stated that Owens Corning had several specific due diligence requests and required a limited number of targeted meetings with key personnel in order to complete its due diligence, and requested a period of exclusivity to complete the required due diligence and finalize definitive transaction documents in a quick and efficient manner. Also on June 5, 2023, confirming the credibility of the First OC Proposal and Defendants' interest in a potential sale of the Company, defendant Heckes forwarded the First OC Proposal to Byrne, and updated him on the discussion with Chambers.

40. Thus, beginning on June 5, 2023, Defendants were aware of material nonpublic information regarding the true value of Masonite common stock. Defendants knew, but failed to disclose, that a credible, strategic buyer with committed financing had made a credible offer to acquire all outstanding shares of Masonite for a significant premium, and that the Board would seriously consider the offer. Therefore, beginning on June 5, 2023, Defendants had a duty to disclose this material nonpublic information or abstain from trading in Masonite securities.

41. On June 9, 2023, the Board held a meeting with members of Masonite's senior management, including defendant Heckes. Additionally, representatives from Wachtell Lipton, Masonite's legal advisor, were present. During the meeting, defendant Heckes explained that, since receiving the First OC Proposal, Masonite had, among other things, discussions with Wachtell Lipton and meetings with several potential financial advisors to assist Masonite in evaluating and responding to the First OC Proposal. Additionally, Masonite created an "Advisory Group" of certain directors and defendant Heckes, which would, among other things: (i) consider retention of experienced financial advisors; (ii) analyze the First OC Proposal; and (iii) prepare materials and analysis to assist the Board in evaluating and responding to the First OC Proposal.

42. On June 11, 2023, the Advisory Group met with certain senior management, including defendant Tiejema, then CFO of Masonite, as well as representatives from Wachtell Lipton. During the meeting, the Individual Defendants recommended selecting Goldman Sachs as financial advisor in connection with the potential transaction with Owens Corning. The Advisory Group agreed, and the Board later approved the retention of Goldman Sachs. Masonite subsequently entered into a formal engagement letter with Goldman Sachs.

43. On June 12, 2023, representatives from Masonite sent a written response to Owens Corning indicating Masonite was in the process of evaluating the First OC Proposal and would respond once it was ready to do so.

44. On June 29, 2023, the Board held a meeting with Masonite's senior management and representatives of each of Wachtell Lipton, Goldman Sachs, and Cassels Brock & Blackwell (Masonite's British Columbia, Canada legal advisor). The Board reviewed the financial projections that had been prepared by Masonite's management. Representatives of Goldman Sachs reviewed with the Board its preliminary financial analyses, including based on management's financial projections, and answered questions from the directors regarding the preliminary financial analyses. The Board discussed with Masonite's management and its advisors a range of potential responses to Owens Corning regarding the First OC Proposal and related considerations. After discussion, members of the Board directed management to update the financial projections to reflect certain growth initiatives and additional opportunities, as contemplated by the management standalone plan, in order for the Board to better understand the potential impact of these initiatives and opportunities on the projections and related financial analyses.

45. On July 6, 2023, the Board held another meeting with senior management and representatives from Wachtell Lipton and Goldman Sachs. After reviewing and discussing

preliminary financial analyses for the First OC Proposal, the Board determined that the First OC Proposal undervalued Masonite, and authorized Masonite's management to reject the First OC Proposal. The Board, however, did not close the door on a potential transaction with Owens Corning, and noted that if Owens Corning wished to present a higher proposal, the Board would consider it. On July 6, 2023, Masonite's common stock price closed at $96.53 per share, significantly below the First OC Proposal. Thus, even though Masonite declined the First OC Proposal, Defendants were aware that Owens Corning was motivated to complete a transaction and negotiations remained alive.

46. The next day, July 7, 2023, Masonite sent Owens Corning a letter indicating that Masonite was not interested in engaging in further discussions regarding the First OC Proposal.

47. On July 13, 2023, less than a week after Masonite rejected the First OC Proposal, Owens Corning delivered another letter to Masonite, detailing Owens Corning's revised proposal to acquire all of the outstanding Masonite shares for $128.00 in cash per share (the "Second OC Proposal"). Also on July 13, 2023, Chambers contacted defendant Heckes and "expressed the strategic importance to Owens Corning of a potential transaction between" Owens Corning and Masonite.[2] Defendant Heckes shared the Second OC Proposal with Byrne and updated him on the discussion with Chambers on the same date. The Second OC Proposal was made available to the Board later that day. The closing price of Masonite common shares on July 12, 2023 was $101.40 per share.

**Defendants Begin Sharing Strategic and Financial Information with Owens Corning**

48. The next day, on July 14, 2023, the Board held a meeting with senior management and representatives from Wachtell Lipton and Goldman Sachs. During the meeting, defendant

[2] Definitive Proxy Statement, filed on SEC Schedule 14A with the SEC by Masonite on March 22, 2024 (the "Proxy Statement").

Heckes noted that Chambers emphasized that the Second OC Proposal relied solely on publicly available information. According to the Proxy Statement, the Board "determined that the Second OC Proposal continued to undervalue Masonite, ***but the Board of Directors agreed that it would be in the best interest of Masonite and its shareholders to share certain strategic and financial information with Owens Corning***," so that Owens Corning would potentially make a proposal providing greater value than the Second OC Proposal. The Board directed Masonite's management to coordinate with Wachtell Lipton about communicating this message to Owens Corning.

49. Despite agreeing that it would be in the best interest of Masonite shareholders to share strategic and financial information with Owens Corning after receiving the Second OC Proposal, Defendants consciously chose not to tell the public about its agreement to share this proprietary and sensitive information with Owens Corning, nor Owens Corning's offers to acquire Masonite.

50. On July 19, 2023, Masonite and Owens Corning entered into a confidentiality agreement that included an 18-month standstill with a fallaway provision. The agreement provided protection for Masonite by preventing Owens Corning from using Masonite's sensitive financial information for its own benefit and protected Owens Corning by giving it the right of last refusal in the case of a competing bid. Thus, the confidentiality agreement further illustrates the seriousness of Owens Corning's offers and Masonite's receptiveness to further negotiations in the hopes of receiving a better offer from Owens Corning.

51. Beginning no later than August 2, 2023, representatives from Owens Corning and its advisors conducted diligence focused on Masonite's business strategy, financial projections and growth initiatives, and additional opportunities. Members of Masonite's management, along with representatives of Goldman Sachs, engaged in due diligence calls and virtual meetings with

representatives of Owens Corning. Moreover, members of Masonite's management responded to written due diligence requests from representatives of Owens Corning.

**Defendants Conceal Owens Corning's Repeated Acquisition Offers and Repurchase Shares Until the End of the Class Period**

52. After the market closed on August 8, 2023, and in the midst of providing material nonpublic information to Owens Corning in the hopes of receiving a better offer to acquire the Company, Masonite announced its financial results for the quarter ended July 2, 2023 ("2Q23"). A press release dated August 8, 2023, filed with the SEC on Form 8-K on August 8, 2023 (the "Aug. 2023 Form 8-K") stated that "[d]uring the second quarter, Masonite repurchased approximately 159,145 shares of stock for $14 million, at an average price of $90.58[,]" but did not disclose the First OC Proposal, the Second OC Proposal, or the ongoing acquisition-related communications with Owens Corning.

53. Before the market opened on August 9, 2023, Masonite hosted an earnings call with analysts and shareholders to discuss the Company's 2Q23 financial results (the "Aug. 2023 Call"). During the Aug. 2023 Call, defendant Tiejema told analysts and investors that "[d]uring the second quarter, Masonite repurchased approximately 159,000 shares of stock for $14 million at an average price of $90.58." Defendant Tiejema, however, failed to disclose that Masonite had received two offers to purchase all outstanding shares of Masonite common stock for $120.00 and $128.00 cash per share, respectively.

54. Moreover, in the Company's Form 10-Q for 2Q23, dated August 9, 2023 (the "2Q23 Form 10-Q"), Masonite provided a month-by-month breakdown of its share repurchases in 2Q23:

| Date | Total Number of Shares Purchased | Average Price Paid Per Share | Total |
|---|---|---|---|
| April 3, 2023 through April 30, 2023 (Pre-Class Period) | 23,891 | $88.26 | $2,108,619.66 |
| May 1, 2023 through May 28, 2023 (Pre-Class Period) | 56,124 | $92.17 | $5,172,949.08 |
| May 29, 2023 through July 2, 2023 | 79,130 | $90.15 | $7,133,569.50 |
| **Total** | **159,145** | **$90.58** | **$14,415,354.10** |
| **Class Period Total (% of 2Q23)** | **79,130 (49.7%)** | **$90.15 (N/A)** | **$7,133,569.50 (49.5%)** |

55. As demonstrated by the above chart, Defendants repurchased 79,130 shares of Masonite common stock during the period from May 29, 2023 through July 2, 2023, likely meaning that a significant portion of these purchases were made: (i) ***after*** Defendants received the First OC Proposal on June 5, 2023; (ii) ***while*** Defendants were analyzing the First OC Proposal; and (iii) ***before*** Defendants agreed to reject the First OC Proposal on July 6, 2023. Defendants repurchased nearly as many shares during the final month of 2Q23 (*i.e.*, after Defendants received the First OC Proposal but before they rejected it) as in the first two months of 2Q23 combined. Defendants repurchased these shares for an average price of $90.15 per share, despite knowing – yet refusing to disclose to investors – that Owens Corning was willing to pay at least $120.00 per share. Indeed, Defendants turned down the First OC Proposal because, in their opinion, it ***undervalued*** the Company. Defendants were aware that negotiations with Owens Corning remained alive. While Defendants disclosed these repurchases, they categorically failed to disclose the First OC Proposal.

56. Defendant Tiejema signed the 2Q23 Form 10-Q, and defendants Heckes and Tiejema signed SOX certifications dated August 9, 2023 attesting that the 2Q23 Form 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

57. Masonite's 2Q23 Form 10-Q stated the following regarding Masonite's share repurchase program:

> Under this program, the Company may repurchase shares from time to time, depending on market conditions and alternate uses of capital. The timing and actual number of shares repurchased will depend on a variety of factors, including price, general business and market conditions and alternate uses of capital. The share repurchase program may be effected through Rule 10b5-1 plans, open market purchases, ***each in compliance with Rule 10b-18 under the Exchange Act***, or privately negotiated transactions.

58. Defendants' statements regarding compliance under Rule 10b-18 were false and misleading when made because Masonite was repurchasing shares of its own stock while in possession of material nonpublic information, which Rule 10b-18 prohibits.

59. On August 11, 2023, certain members of Masonite's and Owens Corning's management teams, along with representatives of Goldman Sachs and Owens Corning's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley"), met in person in Tampa, Florida, to discuss, among other things, (i) defendant Heckes' vision for Masonite's growth opportunities and initiatives, and other business, pricing and marketing strategies; (ii) Masonite's innovation pipeline and strategy; and (iii) areas of Owens Corning's due diligence review.

60. On September 19, 2023, Masonite held a virtual investor day (the "2023 Investor Day"). During the 2023 Investor Day, defendant Tiejema told investors and analysts that part of Masonite's "capital allocation strategy" included "***using share repurchase as our form of***

***distributing capital back to the investor base***." Masonite's common stock price closed at $94.99 per share on September 19, 2023.

61. According to defendant Tiejema, Defendants were using share repurchases to "distribut[e] capital back to" investors such as Lead Plaintiff and members of the Class. Unbeknownst to investors, however, Defendants knew, but failed to disclose, that Masonite had received the Second OC Proposal, offering to pay $128.00 per share of Masonite common stock, and were providing proprietary strategic and financial information to Owens Corning in the hopes of receiving a better offer. Thus, under the guise of "distributing capital back to the investor base[,]" Defendants were repurchasing shares from unsuspecting investors for far less than the Second OC Proposal.

62. On September 22, 2023, Chambers contacted defendant Heckes to reaffirm Owens Corning's interest in pursuing a transaction. Later that day, defendant Heckes and Chambers had a call during which Chambers stated that Owens Corning would deliver a revised proposal.

63. Then, on September 25, 2023, after nearly two months of due diligence, Owens Corning delivered a letter to Masonite memorializing a proposal to acquire all outstanding shares of Masonite for $132.00 in cash per share (the "Third OC Proposal"). The closing price of Masonite common stock on September 22, 2023 was $93.09 per share. The letter also stated that Owens Corning had only limited confirmatory due diligence outstanding and was ready to progress quickly towards entering into a definitive transaction agreement ***no later than Masonite's third quarter of 2023 earnings announcement***, estimated to be during the week of November 6, 2023. The Board was made aware of the Third OC Proposal that same day.

64. On October 2, 2023, the Board held a meeting with members of Masonite's senior management, as well as representatives of Wachtell Lipton and Goldman Sachs. During the

meeting, the Board determined that the Third OC Proposal continued to undervalue Masonite, and turned down the Third OC Proposal. The Board, however, decided that management should communicate to Owens Corning that the Board was seeking a purchase price of no less than $140.00 per share. Masonite's common stock price closed at $92.93 per share on October 2, 2023.

65. The next day, on October 3, 2023, defendant Heckes contacted Chambers and informed him of the Board's decision. Defendant Heckes also relayed the Board's message regarding the Board's price target.

66. Between October 5, 2023 and November 7, 2023, Masonite provided additional financial modeling to Owens Corning, and met with Owens Corning senior management to discuss Masonite's financial outlook in the coming years.

67. Also during this period, on October 25, 2023, at Masonite's direction, Jefferies LLC ("Jefferies"), a financial advisor of Masonite not yet engaged in connection with the Owens Corning negotiations, informed PGTI through its financial advisor that Masonite was interested in making a mixed cash-and-stock bid to acquire PGTI.

68. On October 27, 2023, Masonite and PGTI entered into a confidentiality agreement including a nine-month standstill period. Thus, in the midst of escalating discussions regarding a potential transaction with Owens Corning, Masonite was also contemplating acquiring PGTI. Despite Masonite now being involved in two separate business combination negotiations, Defendants refused to reveal this information to its investors.

69. On November 7, 2023, after the market closed, Masonite announced its financial results for the quarter ended October 1, 2023 ("3Q23"). A Masonite press release dated November 7, 2023 and filed with the SEC on Form 8-K on November 7, 2023 (the "Nov. 2023 Form 8-K") stated: "***During the third quarter, Masonite repurchased approximately 106,329 shares of stock***

***for $10 million, at an average price of $94.05***." Despite referencing the repurchases in 3Q23, the Nov. 2023 Form 8-K failed to disclose that Masonite had now received three credible offers from Owens Corning to acquire all outstanding Masonite shares.

70. Before the market opened on November 8, 2023, Masonite hosted an earnings call with analysts and shareholders to discuss the Company's 3Q23 financial results (the "Nov. 2023 Call"). During the Nov. 2023 Call, defendant Tiejema told analysts and investors that "***[d]uring the third quarter, Masonite repurchased approximately 106,000 shares of stock for $10 million at an average price of $94.05***." Defendant Tiejema made no mention of Owens Corning's offers.

71. According to the Company's Form 10-Q for 3Q23, dated November 8, 2023 (the "3Q23 Form 10-Q"), which was signed by defendant Tiejema, all of Masonite's 3Q23 repurchases were made between August 28, 2023 and October 1, 2023, meaning after Masonite had received the Second OC Proposal (for $128.00 cash per share) on July 13, 2023, and during the same time Masonite received the Third OC Proposal (for $132.00 cash per share) on September 25, 2023:

| Date | Total Number of Shares Purchased | Average Price Paid Per Share | Total |
|---|---|---|---|
| August 28, 2023 through October 1, 2023 | 106,329 | $94.05 | $10,000,242.45 |
| **Total** | **106,329** | **$94.05** | **$10,000,242.45** |

72. Unbeknownst to investors, Masonite made these purchases, at an average price of $94.05, with knowledge that Owens Corning was willing to pay ***at least*** 36% to 40% more for those shares. While Defendants rejected the Second OC Proposal and Third OC Proposal, they continued to engage with Owens Corning in hopes of receiving a better offer.

73. Defendant Tiejema signed the 3Q23 Form 10-Q and defendants Heckes and Tiejema signed SOX certifications dated November 8, 2023 attesting that the 3Q23 Form 10-Q did not

contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

74. Masonite's 3Q23 Form 10-Q stated the following regarding Masonite's share repurchase program:

> Under this program, the Company may repurchase shares from time to time, depending on market conditions and alternate uses of capital. The timing and actual number of shares repurchased will depend on a variety of factors, including price, general business and market conditions and alternate uses of capital. The share repurchase program may be effected through Rule 10b5-1 plans, open market purchases, ***each in compliance with Rule 10b-18 under the Exchange Act***, or privately negotiated transactions.

75. Defendants' statements regarding compliance under Rule 10b-18 were false and misleading when made because Masonite was repurchasing shares of its own stock while in possession of material nonpublic information, which Rule 10b-18 prohibits.

76. On November 14, 2023, in the midst of its negotiations with Owens Corning, Masonite submitted a written proposal to acquire PGTI for $37.00 per share of PGTI common stock, comprised of $30.96 per share in cash and $6.04 per share in Masonite common shares. PGTI rejected this offer, and noted that the offer would have to be at least $40.00 per share in order for PGTI to be willing to open negotiations with Masonite.

77. On November 16, 2023, Masonite submitted yet another written offer to acquire PGTI, this time for $38.50 per share of PGTI common stock, comprised of $31.93 in cash and $6.57 in Masonite common shares. In its offer, Masonite further stated that it would deliver definitive financing commitment papers at signing and that the proposed transaction would not be subject to a financing contingency. Defendant Heckes and Jeff Jackson ("Jackson"), PGTI's CEO, held a call on November 16, 2023, and Jackson reiterated that PGTI expected an offer of at least $40.00 per share and that he needed to hear back by the end of day on November 17, 2023.

78. On November 17, 2023, the Board held a meeting with members of Masonite's senior management, including defendant Heckes, as well as representatives from Wachtell Lipton and Jefferies. During the meeting, the Board discussed the proposed acquisition of PGTI.

79. Later that day, Masonite submitted a revised non-binding written offer to acquire PGTI for $40.00 per share of PGTI common stock, comprised of $33.50 in cash and $6.50 in Masonite shares. Defendants, now in serious negotiations regarding two distinct potential business combinations, continued to keep investors in the dark regarding both potential transactions.

80. On November 20, 2023, defendant Heckes and Chambers met in Tampa, Florida, and Chambers delivered a letter containing a revised proposal to acquire all of the outstanding Masonite common shares for $120.00 in cash per share (the "Fourth OC Proposal"). According to Chambers, the reduced purchase price reflected Masonite's reduced projected 2024 adjusted EBITDA, headwinds in the end markets for Masonite products, expected volume share loss, reduced expected EBITDA margins in the short term, investor reaction to Masonite's 2023 Investor Day, analyst consensus regarding Masonite's share price, and other macro headwinds.

81. On November 21, 2023, the Board held a meeting by videoconference with members of Masonite's senior management and Wachtell Lipton. During the meeting, defendant Heckes provided the Board with an update regarding the Fourth OC Proposal and explained the reasoning Chambers conveyed the prior day regarding the revised purchase price reflected in the Fourth OC Proposal. After discussion, the Board determined, in light of Owens Corning's reduced offer price and Masonite's potential transaction with PGTI, Masonite would focus on the acquisition of PGTI. It is unclear whether Defendants communicated the Board's decision to Owens Corning.

82. Also on November 21, 2023, Masonite entered into an exclusivity agreement with PGTI. Between November 22, 2023 and December 17, 2023, Masonite and PGTI negotiated the material terms of the proposed transaction and engaged in due diligence.

83. On December 17, 2023, Masonite and PGTI exchanged revised drafts of the merger agreement, and ultimately agreed that the merger agreement would reflect total consideration of $41.00 per share of PGTI common stock, comprised of $33.50 in cash and $7.50 in Masonite common stock.

84. On the night of December 17, 2023, the Board convened for a meeting and unanimously approved the transaction with PGTI. Masonite, its merger subsidiary, and PGTI executed the merger agreement that night.

85. On December 18, 2023, prior to market open, Masonite announced the PGTI Deal, whereby PGTI shareholders would receive $41.00 per each PGTI share they own, comprised of $33.50 in cash and $7.50 in Masonite common shares, for a total transaction value of about $3.0 billion. According to defendant Heckes in a press release filed with the SEC on Form 8-K on December 18, 2023, "[t]he combined business will be well positioned to provide homeowners with differentiated solutions across both the interior and exterior openings of the home, while significantly expanding our geographic presence and growth opportunities."

86. On January 2, 2024, PGTI announced that MITER Brands had provided to PGTI an unsolicited proposal to acquire PGTI for $41.50 per each PGTI share.

87. On January 3, 2024, Chambers called defendant Heckes to reiterate Owens Corning's continued interest in pursuing an acquisition of Masonite. Later that same day, Owens Corning delivered another letter to Masonite proposing to acquire all of the outstanding Masonite common

shares for $132.00 in cash per share should the PGTI Deal be terminated (the "Fifth OC Proposal"). The Fifth OC Proposal was made available to the Board that day.

88. On or about January 4, 2024, Masonite's management informed Jefferies of the Fifth OC Proposal and Owens Corning's prior proposals in order for Jefferies to assist Masonite on potential next steps for both the potential acquisition of PGTI and the potential transaction with Owens Corning. Masonite subsequently entered into a formal engagement letter with Jefferies in connection with the potential transaction with Owens Corning. Even with the PGTI Deal hanging in the balance, and Masonite's renewed interest in a transaction with Owens Corning, Defendants said nothing to investors regarding Owens Corning's proposals.

89. On January 11, 2024, Deutsche Bank Research published a report on Masonite following a meeting with the Individual Defendants on or about January 10, 2024. According to Deutsche Bank Research, the Individual Defendants "reiterat[ed] their commitment to the current agreement in place to acquire PGTI for $41/sh in cash and stock[.]"

90. On January 13, 2024, the Board held a meeting by videoconference with members of Masonite's senior management and representatives of Wachtell Lipton, Goldman Sachs, and Jefferies. During the meeting, defendant Heckes and the Board reviewed the terms proposed in the Fifth OC Proposal, including in the context of the status of the pending PGTI Deal. Defendant Heckes noted that while the potential PGTI Deal was pending, the Board was unable to accept the Fifth OC Proposal, given that the terms of the Fifth OC Proposal assumed termination of the transaction to acquire PGTI. Also during the meeting, Goldman Sachs told the Board that, following discussions with Owens Corning's financial advisor, Morgan Stanley, Owens Corning and Morgan Stanley believed that due diligence and the negotiation of a definitive transaction agreement ***could be completed within seven to ten days***.

91. Additionally, during the meeting on January 13, 2024, although the PGTI Deal was pending, the Board instructed Masonite's management and representatives of Goldman Sachs to update the financial analyses utilizing Masonite's management's current financial projections for purposes of presenting such financial analyses to the Board at the following meeting in connection with its consideration of a potential response to Owens Corning. The Board also determined that, if the PGTI Deal was terminated, the risks of contacting other parties to gauge their interest in a potential transaction with Masonite outweighed the potential benefits of such outreach at that time. Thus, Defendants had solidified their plan to negotiate ***exclusively*** with Owens Corning in the event they determined not to offer a revised proposal to PGTI.

92. On January 17, 2024, Masonite announced the termination of the PGTI Deal after the Board had decided not to offer a revised proposal in response to MITER Brands' bid. Upon termination of the PGTI Deal, Masonite received a breakup fee of $84 million. Later that day, MITER Brands and PGTI announced they had entered into a definitive merger agreement under which MITER Brands would acquire all outstanding shares of PGTI at a price of $42.00 per share in cash, for a total transaction value of about $3.1 billion. Even after the termination of the PGTI Deal, Defendants again failed to inform investors about its now exclusive discussions with Owens Corning and Defendants' evaluation of the Fifth OC Proposal, which was contingent on the termination of the PGTI Deal.

93. Instead, in a Masonite press release dated January 17, 2024 and filed on January 17, 2024 with the SEC on Form 8-K (the "Jan. 2024 Form 8-K"), defendant Heckes told investors:

> ***The decision to waive our right to increase our offer reflects our commitment to financial discipline and rigor in our strategic investments[.] . . . We remain focused on the execution of our Doors That Do More™ growth initiatives and the pursuit of our 2027 financial goals***. I am confident in Masonite's ability to create long-term value for our customers and our shareholders as we continue to deliver reliable supply, drive product leadership and win the sale."

94. Following the announcement, a Wedbush analyst noted in a January 17, 2024 report: "Based on Masonite's 1/16/24 closing price of $85.21, the company ***could potentially repurchase approximately 986k shares of common stock with the termination fee proceeds*** which is equal to 4.4% of the 22.3 million diluted shares outstanding at F3Q23. At F3Q23, Masonite had just over $207 million remaining on the current share repurchase authorization." Similarly, a January 18, 2024 report from Oppenheimer noted that "[t]he next focus is M&A, ***followed by returning capital to shareholders with share repurchases***" and "[i]t's likely the company will continue to prioritize bolt-on M&A opportunities and ***repurchasing shares going forward***."

95. Thus, even though Defendants had determined to engage exclusively with Owens Corning and evaluate the Fifth OC Proposal, Defendants continued to conceal the negotiations from the public entirely.

96. After the PGTI Deal unraveled, Defendants immediately pivoted back to Owens Corning and the Fifth OC Proposal. On January 17, 2024, the Board held a meeting by videoconference with members of Masonite's senior management and representatives of Wachtell Lipton, Goldman Sachs, and Jefferies. During the meeting, the Board reviewed updated financial projection for the Company. After discussion, the Board directed Masonite's management to inform Owens Corning that Masonite was willing to engage in a confirmatory due diligence process and negotiation of definitive transaction documents, with the understanding that further negotiation of price and terms would be required. Said another way, mere hours after telling investors that Masonite "remain[ed] focused" on continuing towards its strategic and financial goals, Defendants decided to sell the Company to Owens Corning at a significant premium to its then-current stock price. Masonite's common stock price closed at $90.93 per share on January 17, 2024.

97. On January 22, 2024, representatives of Davis Polk & Wardwell LLP ("Davis Polk"), Owens Corning's legal advisor, provided a draft arrangement agreement to representatives of Wachtell Lipton.

98. Between January 17 and 31, 2024, representatives of Masonite, Wachtell Lipton, and Goldman Sachs had numerous conversations with representatives of Owens Corning and its advisors expressing that $132.00 in cash per share would not be a sufficient price for the Board to approve a transaction with Owens Corning. During this two-week period, Masonite's common stock price never closed above $93.35 per share.

99. On January 25 and 26, 2024, representatives of Owens Corning conducted in-person site visits at Masonite's facilities in: (i) Pittsburg, Kansas; (ii) Laurel, Mississippi; and (iii) Mesquite, Texas. On January 28, 2024, representatives of Wachtell Lipton provided a mark-up of the draft arrangement agreement to representatives of Davis Polk. On January 29 and 30, 2024, representatives of Masonite held due diligence calls with representatives of Owens Corning, and during January and February 2024, representatives of Masonite continued to respond to written due diligence requests from representatives of Owens Corning. Even as negotiations and due diligence with Owens Corning escalated, Defendants still refused to inform investors about the now-imminent transaction with Owens Corning.

100. Then, on January 31, 2024, representatives of Davis Polk provided a revised draft arrangement agreement to representatives of Wachtell Lipton. On the same day, Chambers informed defendant Heckes that Owens Corning would increase its proposal to $133.00 in cash per share (the "Final OC Proposal"), subject to certain terms. On January 31, 2024, Masonite's common stock closed at $92.05 per share.

101. On February 1, 2024, the Board held a meeting by videoconference with members of Masonite's senior management and representatives of Wachtell Lipton, Goldman Sachs, and Jefferies. During the meeting, defendant Heckes informed the Board of the Final OC Proposal.

102. On February 4, 2024, the Board held a meeting by videoconference with members of Masonite's senior management and representatives of Wachtell Lipton, Goldman Sachs, and Jefferies. During the meeting, defendant Heckes provided an update to the Board regarding the remaining open matters in the due diligence and negotiation process with Owens Corning. Additionally, representatives from Wachtell Lipton provided an update on the key terms of the arrangement agreement. Defendant Heckes then provided the Board with an update regarding the communication and rollout plan in connection with an announcement of the potential transaction with Owens Corning. After nearly eight months of negotiations following the First OC Proposal, Defendants still had not apprised investors of the looming transaction.

103. On February 8, 2024, the Board held a meeting by videoconference with members of Masonite's senior management and representatives of Wachtell Lipton, Goldman Sachs, and Jefferies. During the meeting, the Board determined that the Final OC Proposal was in the best interest of Masonite. Later that day, Masonite, Owens Corning, and Owens Corning's subsidiary MT Acquisition Co ULC executed an arrangement agreement memorializing the acquisition of Masonite.

104. On February 9, 2024, prior to market open, Masonite issued a press release announcing the execution of the arrangement agreement. Finally, eight months after receiving the First OC Proposal, Defendants apprised investors that Owens Corning was willing to pay a significant premium over the market price for Masonite common stock. On this news, Masonite's

common stock price skyrocketed to $130.51 per share at market close on February 9, 2024, a 35.1% increase over the prior trading day's closing price, with over five million shares traded.

105. The market took note of the staggering premium to Masonite's then-current stock price – and highlighted that this was an unexpected departure from Masonite's disclosed business strategy.

106. A Wedbush analyst in a February 9, 2024 report explained that, following the failed PGTI Deal, they "expected the company to regroup and focus on regaining operating momentum in the core residential business[,] . . . [i]nstead, [Masonite] has agreed to be acquired at what we estimate is an all time high stock price[.]" An Oppenheimer analyst voiced similar surprise in a February 11, 2024 report: "***The transaction will come as a surprise***, given just a few weeks ago [Masonite] was competing for the PGT Innovations acquisition."

107. A February 9, 2024 analyst report from Stephens highlighted that the deal "represent[ed] a 38% premium to the closing price on 02/08/24" and was a "***favorable outcome for [Masonite] shareholders***." Moreover, a report from RBC Capital Markets published February 9, 2024 noted: "All in, the price paid for the deal presents ***a compelling premium for DOOR shareholders*** (in our view) following its own recent failed acquisition bid[.]" A Deutsche Bank Research report dated February 12, 2024 also noted that "***[t]he benefit for [Masonite] shareholders is clear***."

108. After the Class Period, on February 29, 2024, Masonite filed its Form 10-K for the 2023 fiscal year (the "2023 Form 10-K"), which was signed by defendant Tiejema. In the 2023 Form 10-K, Masonite disclosed that, in the quarter ended December 31, 2023 ("4Q23"), it had repurchased 83,528 shares of Masonite common stock at an average price of $88.88, for a total of approximately $7.4 million dollars.

109. The 2023 Form 10-K included Masonite's share repurchases in 4Q23 by month, depicted below:

| **Date** | **Total Number of Shares Purchased** | **Average Price Paid per Share** | **Total** |
|---|---|---|---|
| October 2, 2023 through October 29, 2023 | N/A | N/A | N/A |
| October 30, 2023 through November 26, 2023 | 30,002 | $86.20 | $2,586,172.40 |
| November 27, 2023 through December 31, 2023 | 53,526 | $90.38 | $4,837,679.88 |
| **Total** | **83,528** | **$88.88** | **$7,423,852.28** |

110. Thus, between October 30, 2023 and December 31, 2023, when Defendants had already received the Third OC Proposal (for $132.00 cash per share) on September 25, 2023, and the Fourth OC Proposal (for $120.00 cash per share) on November 20, 2023, Defendants refused to disclose that Owens Corning was willing to pay between 35%-48.5% more than the average $88.88 price per share Masonite was paying to its shareholders, and repurchased 83,528 shares of Masonite stock at artificially deflated prices.

111. On March 22, 2024, Masonite filed with the SEC the Proxy Statement.

112. On May 15, 2024, Owens Corning completed its acquisition of Masonite.

113. Defendants' failure to disclose that an acquisition of Masonite at a significant premium to Masonite stock's market price had been proposed by a serious, financially capable bidder materially misled investors and artificially deflated the price of Masonite common stock during the Class Period, and Masonite took advantage of those artificially lower prices by repurchasing shares.

114. Defendants' actions also constituted a device, scheme, or artifice to defraud, and/or operated as a deceit upon Lead Plaintiff and the Class, in violation of Section 10(b) and Rule 10b-5.

## DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS

### Defendants Violated Their Duty to Disclose Owens Corning's Credible Acquisition Offers or Abstain from Trading in Masonite Securities

115. Beginning in June 2023, Defendants were aware of material nonpublic information regarding Owens Corning's ongoing and serious interest in acquiring Masonite, and had a duty to disclose that information or abstain from trading in Masonite securities. Defendants knew that Owens Corning had communicated all-cash proposals offering a significant premium over Masonite's then-current trading price, backed by committed financing and a credible intention to complete the transaction. The Board engaged in internal deliberations regarding these proposals, including obtaining legal and financial advice from Wachtell Lipton and Goldman Sachs, and concluded that the First OC Proposal, even at a significant premium to market, undervalued the Company. Nevertheless, Defendants continued to engage with Owens Corning in order to receive better acquisition offers – including by providing proprietary strategic and financial information with Owens Corning – and Masonite repurchased hundreds of thousands of shares at prices far below Owens Corning's offers, while concealing from investors that a credible buyer was willing to pay a large premium over the market price for all outstanding Masonite stock.

116. While repurchasing its own stock from June 2023 until the end of the Class Period, Masonite was aware of material nonpublic information that a credible, strategic acquirer had initiated a prospective acquisition process, was actively engaged in due diligence, and had increased its bid over time, and that Masonite's response had advanced through Board-level consideration. The undisclosed material facts included: (i) the offers by Owens Corning, a leading global manufacturer of composite and building materials readily capable of financing an acquisition of

Masonite, to acquire Masonite for significant premiums to its stock's market price; (ii) the Board's stated belief that Masonite stock was worth more than Owens Corning's offers and the Board's demonstrated interest in negotiating for a better offer; (iii) Owens Corning's increasing bid price; (iv) ongoing communications among Owens Corning, the Individual Defendants, and the Board; and (v) Masonite sharing proprietary strategic and financial information with Owens Corning, further underscoring the seriousness and materiality of the ongoing acquisition.

117. Without disclosing any of this material nonpublic information, Masonite repurchased approximately $25 million worth of its common stock in the open market during the Class Period. These repurchases were executed at prices significantly below Owens Corning's offers and the ultimate deal price. Defendants' repurchases on the basis of material nonpublic information are depicted in the below chart:



118. Under Section 10(b) and Rule 10b-5, Masonite was required to either abstain from trading in Masonite securities or disclose the material information concerning Owens Corning's acquisition proposals. But Masonite did not disclose this material nonpublic information and did not abstain from trading in its own securities while Defendants were aware of it. Instead, Masonite repurchased millions of shares of its common stock during the Class Period, without disclosure, in violation of the federal securities laws.

**Defendants' Statements Concerning the Share Repurchases Were Materially False and Misleading When Made**

119. Defendants also violated Section 10(b) and Rule 10b-5 by affirmatively disclosing selected information about Masonite's share repurchases without disclosing Owens Corning's offers or the fact that the repurchases occurred while Masonite was aware of material nonpublic information about those offers. At the outset of the Class Period, Masonite began repurchasing its shares on the basis of material nonpublic information and continued to update investors about these buybacks throughout the Class Period, all with no disclosure concerning Owens Corning's repeated offers to buy Masonite's outstanding shares at materially higher prices. Thus, Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

120. The Aug. 2023 Form 8-K stated that "[d]uring the second quarter, Masonite repurchased approximately 159,145 shares of stock for $14 million, at an average price of $90.58."

121. Additionally, during the Aug. 2023 Call, defendant Tiejema told analysts and investors that "[d]uring the second quarter, Masonite repurchased approximately 159,000 shares of stock for $14 million at an average price of $90.58."

122. Moreover, the 2Q23 Form 10-Q, filed with the SEC on August 9, 2023 stated: "During the six months ended July 2, 2023, we repurchased 327,668 of our common shares in the open market at an aggregate cost of $29.1 million as part of the share repurchase programs."

123. The statements in ¶¶120-122 were materially misleading when made because Defendants failed to disclose that Masonite had received the First OC Proposal (for $120.00 per share) on June 5, 2023 and the Second OC Proposal (for $128.00 per share) on July 14, 2023. Defendants repurchased these shares for an average price of $90.15 per share, despite knowing – and refusing to disclose to investors – that Owens Corning was willing to pay at least $120.00 per share. Indeed, Defendants turned down the First OC Proposal and the Second OC Proposal because, in their opinion, they ***undervalued*** the Company. Despite the Board's internal belief that Owens Corning's first two offers undervalued the Company, Defendants continued to negotiate zealously with Owens Corning and were aware that negotiations with Owens Corning remained alive. Further demonstrating their commitment to further negotiations with Owens Corning, no later than August 2, 2023, Defendants began providing proprietary strategic and financial information to Owens Corning in the hopes of receiving a better offer. While Defendants disclosed these repurchases, they categorically failed to disclose the first two proposals, the ongoing communications with Owens Corning, or that Masonite was sharing nonpublic proprietary information with Owens Corning in the hopes of receiving a better offer.

124. The market was highly attuned to Defendants' share repurchases in 2Q23. For example, an analyst from Stephens noted in an August 8, 2023 report that Masonite "[r]epurchased 159K shares" in 2Q23. Similarly, analysts from RBC Capital Markets and Benchmark included in their respective reports, each dated August 10, 2023, a chart tracking the amount Masonite spent on share repurchases, including future projections.

125. During the 2023 Investor Day, defendant Tiejema told investors and analysts:

> ***Let me go back and remind everyone quickly what our capital allocation strategy is***. And we talked a little bit about this during the prepared remarks portion of the program, right? First and foremost is always investing organically into the business. Secondly is M&A, what this question really speaks to. ***And then third would be returns to shareholders that we've been using share repurchase as our form of distributing capital back to the investor base***.

126. The statements in ¶125 were materially false and misleading when made because Defendants knew, but failed to disclose, that Masonite was repurchasing shares from unsuspecting investors at prices significantly below Owens Corning's offers to acquire all outstanding shares of Masonite stock. By this time, Defendants had already received the first two acquisition offers from Owens Corning and determined that both offers (for $120.00 and $128.00 per share, respectively) undervalued Masonite's common stock, yet Defendants continued to negotiate zealously with Owens Corning. Further demonstrating Defendants' commitment to keeping negotiations with Owens Corning alive, since at least August 2, 2023, Masonite had been sharing nonpublic strategic and financial information with Owens Corning to solicit a higher premium offer. Thus, Defendants were not "distributing capital back to the investor base[,]" but were instead repurchasing Masonite shares from investors at materially lower prices than Owens Corning was offering to pay.

127. The market took note of defendant Tiejema's comments regarding Masonite's "capital allocation strategy" and using share repurchases as a "form of distributing capital back to the investor base." For example, a J.P. Morgan North America Equity Research report dated September 19, 2023 noted that "cumulative free cash flow generation during 2024-27 is expected at $1.1 billion, which, along with incremental debt capacity, ***is expected to be allocated towards M&A and share repurchase***." Similarly, a September 20, 2023 report from Stephens noted that Masonite "***plans to execute on their share repurchase authorization of ~$218 million with the remaining capital available for deployment***." Moreover, an analyst from Wedbush explained in a September 20, 2023

report that "***Masonite's capital allocation priorities***" included "***returns to shareholders***" and that Masonite's "targeted allocation" provided for "$600 million for share repurchase/debt reduction."

128. The Nov. 2023 Form 8-K stated: "During the third quarter, Masonite repurchased approximately 106,329 shares of stock for $10 million, at an average price of $94.05."

129. The 3Q23 Form 10-Q stated: "During the nine months ended October 1, 2023, we repurchased 433,997 of our common shares in the open market at an aggregate cost of $39.1 million as part of the share repurchase programs."

130. During the Nov. 2023 Call, defendant Tiejema told analysts and investors that "[d]uring the third quarter, Masonite repurchased approximately 106,000 shares of stock for $10 million at an average price of $94.05."

131. The statements in ¶¶128-130 were materially misleading when made because Defendants failed to disclose that Masonite had received the First OC Proposal (for $120.00 per share) on June 5, 2023, the Second OC Proposal (for $128.00 per share) on July 14, 2023, and the Third OC Proposal (for $132.00 per share) on September 25, 2023. Defendants repurchased these shares for an average price of $94.05 per share, despite knowing – and refusing to disclose to investors – that Owens Corning was willing to pay at least $132.00 per share. Defendants were aware that negotiations with Owens Corning remained alive and that Owens Corning had only limited confirmatory due diligence outstanding and was ready to progress quickly towards entering into a definitive transaction agreement no later than Masonite's 3Q23 earnings announcement. While Defendants disclosed these repurchases, they categorically failed to disclose the three proposals, the ongoing communications with Owens Corning, that Masonite was sharing nonpublic proprietary information with Owens Corning in the hopes of receiving a better offer, or that Owens

Corning was ready to enter into a definitive transactional agreement no later than Masonite's 3Q23 earnings announcement.

132. Once again, the market closely monitored Masonite's share repurchases in 3Q23. For example, an analyst from Stephens in a November 7, 2023 report described as a "[p]ositive[]" that Masonite "[r]epurchased 106.3K shares" in 3Q23. Likewise, a November 8, 2023 report from RBC Capital Markets and a November 10, 2023 report from Benchmark each included a chart tracking the amount Masonite spent on share repurchases, including future projections.

133. Once Defendants chose to speak on the subject of Masonite's repurchases, capital allocation, and share value, they were obligated to disclose the whole truth: that a credible bidder was offering to acquire all of the Company's stock for a significant premium to its market price, that the Board believed Owens Corning's acquisition proposals undervalued the Company and continued to negotiate in the hopes of receiving a better offer, that Owens Corning was willing to move quickly towards entering into a definitive transaction agreement, and that ongoing acquisition-related communications with Owens Corning restricted Masonite's ability to lawfully continue repurchases. By omitting these material facts, Defendants' statements in the Aug. 2023 Call, the Nov. 2023 Call, the 2023 Investor Day, SEC filings, and other investor communications set out above were materially false and misleading in violation of Section 10(b) and Rule 10b-5(b).

**Defendants' Statements Concerning the 2022 Program's Compliance with Rule 10b-18 Were Materially False and Misleading When Made**

134. Defendants also violated Section 10(b) and Rule 10b-5 by affirmatively representing that Masonite's stock repurchases "compli[ed] with Rule 10b-18 under the Exchange Act" when in fact the repurchases violated this rule.

135. Masonite's 2Q23 Form 10-Q stated the following regarding Masonite's share repurchases pursuant to the 2022 Program:

> Under this program, the Company may repurchase shares from time to time, depending on market conditions and alternate uses of capital. The timing and actual number of shares repurchased will depend on a variety of factors, including price, general business and market conditions and alternate uses of capital. The share repurchase program may be effected through Rule 10b5-1 plans, open market purchases, ***each in compliance with Rule 10b-18 under the Exchange Act***, or privately negotiated transactions.

136. The statement in ¶135 that Masonite's share repurchases complied with Rule 10b-18 remained current on the market as Masonite's most recent statement on this subject until the filing of Masonite's next Form 10-Q in November 2023. Rule 10b-18 confers no immunity from possible Rule 10b-5 liability where the issuer engages in the repurchases while in possession of material, nonpublic information concerning its securities, or where purchases are part of a plan or scheme to evade the federal securities laws. This statement became actionable and materially false and misleading when Masonite repurchased stock in June 2023 and subsequent months while aware of material nonpublic information concerning the First OC Proposal (and subsequently, the Second OC Proposal) and Owens Corning's continuous interest in acquiring Masonite for a premium over its stock's market price. At that time, Masonite and the Individual Defendants came under an obligation to either disclose the material nonpublic information about the First OC Proposal and Second OC Proposal or abstain from trading Masonite stock. Accordingly, Defendants had an obligation to update the statement quoted above, but failed to do so, instead continuing to repurchase Masonite stock in violation of Section 10(b), Rule 10b-5, and Rule 10b-18.

137. Masonite's 3Q23 Form 10-Q stated the following regarding Masonite's share repurchase program:

> Under this program, the Company may repurchase shares from time to time, depending on market conditions and alternate uses of capital. The timing and actual number of shares repurchased will depend on a variety of factors, including price, general business and market conditions and alternate uses of capital. The share repurchase program may be effected through Rule 10b5-1 plans, open market purchases, ***each in compliance with Rule 10b-18 under the Exchange Act***, or privately negotiated transactions.

138. The statement in ¶137 that Masonite's share repurchases complied with Rule 10b-18 remained current on the market as Masonite's most recent statement on this subject until the filing of Masonite's Form 10-K in February 2024. Rule 10b-18 confers no immunity from possible Rule 10b-5 liability where the issuer engages in the repurchases while in possession of material, nonpublic information concerning its securities, or where purchases are part of a plan or scheme to evade the federal securities laws. This statement became actionable and materially false and misleading when Masonite repurchased stock in June 2023 and subsequent months while aware of material nonpublic information concerning the First OC Proposal (and subsequently, the Second OC Proposal and Third OC Proposal) and Owens Corning's continuous interest in acquiring Masonite for a premium over its stock's market price. At that time, Masonite and the Individual Defendants came under an obligation to either disclose the material nonpublic information about the first three proposals from Owens Corning or abstain from trading Masonite stock. Accordingly, Defendants had an obligation to update the statement quoted above, but failed to do so, instead continuing to repurchase Masonite stock in violation of Section 10(b), Rule 10b-5, and Rule 10b-18.

139. Rule 10b-18 of the 1934 Act merely provides issuers with a "safe harbor" from liability for manipulation "***solely*** by reason of the manner, timing, price, and volume of their repurchases when they repurchase the issuer's common stock in the market in accordance with [Rule 10b-18's] manner, timing, price, and volume conditions."[3]

140. Regardless of compliance with Rule 10b-18's manner, timing, price and volume conditions, the SEC has made clear:

> ***Rule 10b-18 confers no immunity from possible Rule 10b-5 liability where the issuer engages in the repurchases while in possession of material, non-public information concerning its securities, or where purchases are part of a plan or scheme to evade the federal securities laws***. Therefore, regardless of whether an

[3] 17 C.F.R. §240.10b-18.

> issuer's repurchases technically satisfy the conditions of Rule 10b-18, ***the safe harbor would not be available if the repurchases are fraudulent or manipulative, when all the facts and circumstances surrounding the repurchases are considered (i.e., facts and circumstances in addition to the volume, price, time, and manner of the repurchases)***. For example, the safe harbor would not be available if the repurchases are made as part of a manipulative scheme to influence the closing price of a company's securities, or are done to mask other motives, such as inflating or manipulating short-term earnings.[4]

141. Because Rule 10b-18 provides no safe harbor for repurchases on the basis of material nonpublic information, reasonable investors would understand Defendants' statements that Masonite's repurchases were "each in compliance with Rule 10b-18" to mean that Defendants were not aware of material nonpublic information while conducting the repurchases.

142. From June 2023 onward, however, Masonite's leadership knew that Owens Corning, a credible, strategic buyer with committed financing, was pursuing an acquisition of the Company. Despite the Board rejecting the First OC Proposal, Defendants continuously sought to, and did, elicit higher bids from Owens Corning throughout the Class Period. Defendants were aware of numerous facts demonstrating Masonite's continued interest in selling the Company to Owens Corning at a significant premium, all of which would have been material to investors. Among the undisclosed facts were: (i) the size, premium, and repeated nature of Owens Corning's proposals; (ii) the Board's demonstrated interest in further negotiations to receive a better proposal; (iii) regular communications among Owens Corning, the Individual Defendants, and Board members, including the sharing of Masonite's proprietary strategic and financial information; (iv) Owens Corning's repeated representations that it was willing to move quickly towards entering into a definitive agreement; and (v) Owens Corning's successive bid increases.

---

[4] U.S. Securities and Exchange Commission, Division of Trading and Markets: Answers to Frequently Asked Questions Concerning Rule 10b-18 ("Safe Harbor" for Issuer Repurchases), Dec. 2, 2016, https://www.sec.gov/rules-regulations/staff-guidance/trading-markets-frequently-asked-questions/division-trading-markets-answers-frequently-asked-questions-concerning-rule-10b-18-safe-harbor (last visited June 5, 2026).

143. Although Masonite affirmatively told investors, as quoted above, that its repurchases "were in compliance with Rule 10b-18," Masonite acknowledged that it retained discretion over the timing and amount of the transactions under its repurchase program, telling investors that the Company "may repurchase shares from time to time, depending on market conditions and alternate uses of capital."

144. Masonite executed discretionary open-market repurchases at the very time it was aware of material nonpublic information regarding Owens Corning's ongoing premium acquisition proposals, the Board's internal deliberations, the Board's conclusion that Owens Corning's First OC Proposal undervalued the Company, the Board's desire for a higher offer, and Owens Corning's subsequent increased offers. Thus, Masonite's repurchases were made "while in possession of material, non-public information concerning its securities, or where purchases are part of a plan or scheme to evade the federal securities laws"[5] and did not comply with Rule 10b-18, and therefore Defendants violated Section 10(b) and Rule 10b-5 because the repurchases were made "on the basis of material nonpublic information about [Masonite and its stock], in breach of a duty of trust or confidence that [was] owed . . . to . . . the shareholders of [Masonite] . . . ." 17 C.F.R. §10b5-1(a).

145. By affirmatively stating in the 2Q23 Form 10-Q and 3Q23 Form 10-Q that the repurchase programs were "in compliance with Rule 10b-18," Defendants created the false impression that the Company's trades were executed under the protections of this rule and were not made while Masonite was aware of material nonpublic information that Defendants had a duty to disclose it to Masonite's shareholders if it repurchased Masonite securities. Those statements were

[5] U.S. Securities and Exchange Commission, Division of Trading and Markets: Answers to Frequently Asked Questions Concerning Rule 10b-18 ("Safe Harbor" for Issuer Repurchases), Dec. 2, 2016, https://www.sec.gov/rules-regulations/staff-guidance/trading-markets-frequently-asked-questions/division-trading-markets-answers-frequently-asked-questions-concerning-rule-10b-18-safe-harbor (last visited June 5, 2026).

untrue when made because Masonite had engaged and was engaging in discretionary share repurchases "while in possession of material, non-public information concerning its securities" in violation of Rule 10b-18 throughout the Class Period. Accordingly, Masonite's repurchases during the Class Period under the 2022 Program were not, and had not been, in compliance with Rule 10b-18.

146. Defendants Heckes and Tiejema were senior executives, and they were both aware of the material nonpublic information about Owens Corning's offers. Their knowledge is imputed to Masonite through their positions and through respondeat superior, and therefore Masonite was aware of the material nonpublic information. Because Masonite was aware of the material nonpublic information, the share repurchases were made on the basis of that material nonpublic information and were not in compliance with Rule 10b-18.

147. Defendants' statements in ¶¶135 and 137 that the share repurchases under the 2022 Program were "in compliance with Rule 10b-18" were therefore untrue statements of material fact and omitted material facts necessary to make the statements not misleading in light of the circumstances under which they were made, in violation of Section 10(b) and Rule 10b-5, because Masonite had engaged and was engaging in share repurchases that were not protected by Rule 10b-18's safe harbor.

**Defendants' SOX Certifications Were Materially False and Misleading When Made**

148. Defendants Heckes and Tiejema each signed SOX certifications, dated August 9, 2023, that were attached to the 2Q23 Form 10-Q:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

149. Defendants Heckes and Tiejema each signed SOX certifications, dated November 8, 2023, that were attached to the 3Q23 Form 10-Q and contained identical statements to those alleged in ¶148.

150. The Individual Defendants' statements quoted in ¶¶148-149 were untrue statements of a material fact and omitted material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) and Rule 10b-5, because, as alleged in this Complaint, at the time the statements were made, the documents the certifications were attached to contained false and misleading statements concerning the repurchases and made no disclosure regarding Owens Corning's acquisition proposals, the Board's internally expressed view that Owens Corning's offers undervalued Masonite, the Company's ongoing communications with Owens Corning seeking a higher offer, or the fact that Masonite was conducting discretionary stock repurchases at prices far below Owens Corning's offers while Defendants were aware of that material nonpublic information.

**Defendants' Statements Leading Up to and Following the Termination of the PGTI Deal Were Materially False and Misleading When Made**

151. Defendants also violated Section 10(b) and Rule 10b-5 in that they, on or about January 10, 2024, conspired to disseminate additional false and misleading information concerning Masonite's commitment to the PGTI Deal following the unsolicited acquisition proposal from MITER Brands by informing Deutsche Bank Research that Defendants remained committed to the PGTI Deal, without disclosing that, since January 3, 2024, they had been evaluating the Fifth OC Proposal, which was contingent on the termination of the PGTI. Thus, on January 11, 2024, Deutsche Bank Research published a report entitled "Masonite CEO/CFO Meetings – The Nerve to Do Big Things." This report stated:

> On Wednesday, we hosted investor meetings with Masonite (DOOR) CEO Howard Heckes and CFO Russell Tiejema. ***Messaging around next steps remained tightly***

> ***latched with management reiterating their commitment to the current agreement in place to acquire PGTI for $41/sh in cash and stock***[.] . . . Mr. Heckes yesterday cited the "nerve to do big things" when the conviction around value is there, and agreed that the example is relevant today.

152. The information in ¶151 that Defendants conspired to disseminate, using Deutsche Bank Research as a conduit, was materially false and misleading when disseminated because, since January 3, 2024, they had been evaluating the Fifth OC Proposal, which was contingent on the termination of the PGTI. Moreover, just days after Defendants caused this materially false and misleading information to be disseminated, they decided to exclusively pursue a sale of the Company to Owens Corning. Thus, by "reiterating their commitment to the current agreement" to acquire PGTI, Defendants, using Deutsche Bank Research, materially misled investors into believing that Masonite was focused on completing the PGTI Deal, as opposed to the undisclosed, imminent sale of the Company to Owens Corning for a significant premium.

153. Additionally, Defendants violated Section 10(b) and Rule 10b-5 by affirmatively disclosing selected information about Masonite's reasoning for terminating the PGTI Deal, as well as Masonite's strategic business plan going forward.

154. In the Jan. 2024 Form 8-K regarding the termination of the PGTI Deal, defendant Heckes told investors:

> ***The decision to waive our right to increase our offer reflects our commitment to financial discipline and rigor in our strategic investments[.] . . . We remain focused on the execution of our Doors That Do More™ growth initiatives and the pursuit of our 2027 financial goals***. I am confident in Masonite's ability to create long-term value for our customers and our shareholders as we continue to deliver reliable supply, drive product leadership and win the sale."

155. The statements in ¶154 were materially false and misleading when made because defendant Heckes knew, but failed to disclose, that, on January 13, 2024, the Board met with defendant Heckes and other members of senior management and determined that, should Masonite terminate the PGTI Deal, Defendants would exclusively pursue a sale of the Company to Owens

Corning, including by evaluating the Fifth OC Proposal, which was contingent on the termination of the PGTI Deal. Defendant Heckes also knew that the Board instructed Masonite management to update the financial analyses for purposes of presenting them to the Board at the following meeting in connection with its consideration of a potential response to Owens Corning. Indeed, on January 17, 2024 (*i.e.*, the same day as the Jan. 2024 Form 8-K), the Board directed Masonite's management to inform Owens Corning that Masonite was willing to engage in a confirmatory due diligence process and negotiation of definitive transaction documents. Thus, the decision to no longer pursue the PGTI Deal did not "reflect[] [Defendants'] commitment to financial discipline and rigor in [their] strategic investments," because Defendants' decision was influenced by the fact that Owens Corning was seriously attempting to purchase Masonite and had made an acquisition offer contingent on the termination of the PGTI Deal. Moreover, Defendants did not "remain focused on the execution of [their] growth initiatives and the pursuit of [their] 2027 financial goals," and were instead focused exclusively on negotiating the imminent sale of the Company to Owens Corning for a significant premium over the then-current price of Masonite common stock.

156. The market clearly understood defendant Heckes' comments regarding Masonite's future to indicate that the Company was focused on its stated operational goals, instead of an imminent sale of the Company. Indeed, the market believed that Masonite would continue to repurchase shares to create value for shareholders. For example, a Wedbush analyst noted in a January 17, 2024 report: "Based on Masonite's 1/16/24 closing price of $85.21, the company ***could potentially repurchase approximately 986k shares of common stock with the termination fee proceeds*** which is equal to 4.4% of the 22.3 million diluted shares outstanding at F3Q23. At F3Q23, Masonite had just over $207 million remaining on the current share repurchase authorization." Similarly, a January 18, 2023 report from Oppenheimer noted that "[t]he next focus is M&A,

***followed by returning capital to shareholders with share repurchases***" and "**[*i*]*t's likely the company will continue to prioritize bolt-on M&A opportunities and repurchasing shares going forward*.**"

157. Moreover, following the announcement that Owens Corning agreed to purchase all outstanding Masonite shares, the market voiced its surprise. A Wedbush analyst in a February 9, 2024 report put it: "[W]e expected the company to regroup and focus on regaining operating momentum in the core residential business[,] . . . [i]nstead, [Masonite] has agreed to be acquired at what we estimate is an all time high stock price[.]" Indeed, an Oppenheimer analyst in a February 11, 2024 report called the transaction "***a surprise***, given just a few weeks ago [Masonite] was competing for the PGT Innovations acquisition."

158. Accordingly, Defendants' statements regarding Masonite's plans following the termination of the PGTI Deal were materially false and misleading when made, because Defendants had already determined to exclusively and feverishly pursue a sale of the Company to Owens Corning.

**ADDITIONAL SCIENTER ALLEGATIONS**

159. Masonite and the Individual Defendants acted with scienter because Defendants had actual knowledge of the material undisclosed facts concerning Owens Corning's credible offers to acquire Masonite shares at materially higher prices that rendered their public statements materially false and misleading.

160. Defendants were aware of the details and timing of Owens Corning's offers. Owens Corning communicated its offers to the highest executive level of Masonite – delivering them directly to defendant Heckes – and they were discussed at numerous Board meetings attended by defendants Heckes and Tiejema. Additionally, defendant Heckes communicated Masonite and the Board's responses to Owens Corning's proposals directly to representatives of Owens Corning.

Defendant Heckes was also part of Masonite's Advisory Group, which was created to analyze the First OC Proposal. No later than August 2023, Defendants were also aware that Masonite was providing proprietary strategic and financial information to Owens Corning.

161. Defendants were aware of Masonite's repurchases of millions of dollars of its own stock. Among other things, Defendants disclosed these repurchases in the 2Q23 Form 10-Q, the 3Q23 Form 10-Q, and the 2023 Form 10-K, filed in August 2023, November 2023, and February 2024, respectively. Defendant Tiejema signed these filings, and the Individual Defendants certified their completeness and accuracy in SOX certifications. Moreover, Masonite's disclosures made clear the repurchases were discretionary, noting "the Company may repurchase shares from time to time, depending on market conditions and alternate uses of capital. The timing and actual number of shares repurchased will depend on a variety of factors, including price, general business and market conditions and alternate uses of capital." Defendant Tiejema spoke about the repurchases at Masonite's 2023 Investor Day and on earnings calls.

162. Moreover, leading up to and following the termination of the PGTI Deal, Defendants had already received the Fifth OC Proposal, which was contingent upon the termination of the PGTI Deal, and had agreed to negotiate exclusively with Owens Corning. Defendants were aware that a sale of the Company to Owens Corning was imminent following the termination of the PGTI Deal, as the Board stated that Masonite was willing to engage in a confirmatory due diligence process and negotiation of definitive transaction documents mere hours after announcing the termination of the PGTI Deal to the public.

163. Defendants were aware of the market price of Masonite's stock and were therefore aware that Owens Corning's offers were at prices materially above the market price, as well as that Masonite's repurchases were at prices materially below Owens Corning's offers. Defendants were

also aware that, even if they rejected an offer, Owens Corning could, and routinely did, return with an improved offer.

164. The magnitude and pace of Masonite's stock repurchases during the Class Period also support a strong inference of scienter. Masonite repurchased approximately $25 million worth of stock during the Class Period.

165. In addition to Defendants' actual awareness of the undisclosed material facts, the inference of scienter is enhanced further by the financial motive Defendants had for Masonite to repurchase millions of its shares at prices artificially deflated by Defendants' failure to disclose Owens Corning's offers to acquire those shares at materially higher prices. This strategy would have failed if Defendants had disclosed Owens Corning's offers and Masonite's desire for improved bids before conducting the repurchases, because such disclosure would have caused Masonite's stock price to increase, thereby making the repurchases more expensive and less lucrative. Accordingly, Owens Corning's offers and Defendants' awareness that the Company had received material acquisition proposals for significant premiums gave Defendants an additional motive to repurchase stock without disclosing the proposals.

166. Defendants knew and/or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard by the personnel at the highest levels of the Company, including the Individual Defendants.

167. The Individual Defendants were each executive officers and/or directors of Masonite during the Class Period. Based on their roles at Masonite, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein, which centers on

a sale of the Company at a significant premium over Masonite's then-current stock price. Given the importance of such a sale on the future of the Company, the Individual Defendants knew, or recklessly disregarded, the extent and scope of their statements during the Class Period. At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs that their statements were materially false and misleading or contained material omissions.

168. Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, oversaw the Company as directors on the Board, were directly involved in the day-to-day operations of the Company at the highest levels, and/or were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

## LOSS CAUSATION AND ECONOMIC LOSS

169. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially deflated the prices of Masonite common stock and operated as a fraud or deceit on sellers of Masonite common stock. As detailed above, when the truth about Defendants' misconduct and omissions concerning Owens Corning's offers to purchase the Company was revealed, the price of Masonite common stock increased precipitously as the prior artificial deflation came out. The increase in the price of Masonite common stock was the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the

market. The timing and magnitude of the share price increase negate any inference that the losses suffered by Lead Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially deflate the prices of Masonite common stock and the subsequent significant increase in the value of Masonite common stock when Defendants' prior misrepresentations, omissions, and other fraudulent conduct were revealed.

170. At all relevant times, Defendants' materially false and misleading statements or omissions and fraudulent scheme alleged herein directly or proximately caused the damages suffered by Lead Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Masonite's business, operations, and financial prospects as alleged herein. Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of Masonite common stock to be artificially deflated. Lead Plaintiff and other Class members sold Masonite common stock at those artificially deflated prices, causing them to suffer damages as complained of herein.

171. When the truth regarding Masonite's sale to Owens Corning was disclosed, the market was blindsided by the announcement, and analysts uniformly noted their surprise by the significant premium Owens Corning was willing to pay over Masonite's current common stock price. *See* ¶¶105-107, 157. The disclosure of this news directly led to a 35% increase in Masonite's common stock price, with over five million shares traded on February 9, 2024.

## NO SAFE HARBOR

172. The statutory safe harbor provided for forward-looking statements does not apply to the allegedly false statements and omissions pled in this Complaint. The statements alleged to be false and misleading in this Complaint all relate to then-existing facts and circumstances. To the extent any of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pled in this Complaint, the Company and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, or the forward-looking statement was authorized and approved by an executive officer of the Company who knew that the statement was false and misleading when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

173. Lead Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

174. Without knowledge of the misrepresented or omitted material facts, Lead Plaintiff and other Class members sold Masonite common stock between the time Defendants omitted, misrepresented, and failed to disclose material facts and the time the true facts were disclosed. Accordingly, Lead Plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for Masonite common stock, and are entitled to a presumption of

reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

175. Lead Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Masonite common stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a) Masonite common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

(b) Masonite regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c) Masonite was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

176. As a result of the foregoing, the market for Masonite common stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all those who transacted in Masonite common stock during the Class Period suffered similar injury through their transactions in Masonite common stock at artificially deflated prices, and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

177. Lead Plaintiff brings this action on behalf of all sellers of Masonite common stock during the Class Period who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company ("Excluded D&Os"), the Defendants' and the Excluded D&Os' immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants or Excluded D&Os have or had a controlling interest.

178. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Masonite common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Masonite or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon information and belief, these shares were held by hundreds or thousands of individuals located geographically throughout the country. Joinder would be highly impracticable.

179. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws complained of herein.

180. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

181. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether Defendants omitted or misrepresented material facts;

(c) whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements and/or omissions;

(d) whether the prices of Masonite common stock during the Class Period were artificially deflated because of Defendants' conduct complained of herein; and

(e) whether the members of the Class have sustained damages and, if so, the proper measure of damages.

182. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication effort or expense that numerous individual actions would require.

183. Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

184. No difficulties are likely to be encountered in the management of this action as a class action.

**COUNT I**

**For Violation of §10(b) of the 1934 Act and Rule 10b-5(b)**
**Against All Defendants**

185. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

186. This Count is asserted on behalf of all members of the Class against defendant Masonite and the Individual Defendants for violations of Section 10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. §240.10b-5(b).

187. During the Class Period, Defendants, in violation of Rule 10b-5(b), disseminated, made, or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were false and/or misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not false or misleading.

188. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they sold at artificially deflated prices for Masonite common stock. Lead Plaintiff and the Class would not have sold Masonite common stock at the prices they sold, or at all, if they had been aware that the market prices had been artificially and falsely deflated by Defendants' misleading statements and/or omissions.

189. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their sales of Masonite common stock during the Class Period.

## COUNT II

### For Violation of §10(b) of the 1934 Act and Rule 10b-5(a), (c) Against All Defendants

190. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

191. This Count is asserted on behalf of all members of the Class against the Defendants for violations of Section 10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. §240.10b-5(a), (c).

192. During the Class Period, Defendants had access to the material, nonpublic confidential information concerning the Company and its true prospects alleged herein.

193. Notwithstanding their duty to refrain from trading in Masonite common stock unless they disclosed those material, nonpublic, favorable facts alleged herein, and in violation of their fiduciary duties to Lead Plaintiff and other members of the Class, Defendants engaged in a scheme, practice, and course of business that was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and the Class, as alleged in this Complaint; and (ii) cause Lead Plaintiff and the Class to sell Company common stock at artificially depressed or deflated prices. In furtherance of this unlawful scheme, practice, and course of business, these Defendants, and each of them, took the actions alleged in this Complaint.

194. The magnitude of the proposed transaction, the credibility of the bid by a company of Owens Corning's stature, and the degree of interest shown by Owens Corning, in total, illustrate that Owens Corning's offers would have been material and significant to a reasonable investor in making their investment decision.

195. Defendants caused Masonite to repurchase those shares of common stock, as alleged above, at market prices artificially deflated by the nondisclosure of material, nonpublic, favorable facts during the Class Period.

196. Defendants knew that they were in possession of material, nonpublic, favorable information that was not known to the investing public, including Lead Plaintiff and other members of the Class. Before purchasing that common stock from the public, Defendants were obligated to disclose that material, nonpublic favorable information to Lead Plaintiff and other members of the Class.

197. Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5(a), (c) in that they: (i) employed devices, schemes, and artifices to defraud; and (ii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Lead Plaintiff and others similarly situated in connection with their sale of the Company's common stock.

198. As part of their scheme to defraud investors in violation of Rule 10b-5(a) and (c), Masonite and the Individual Defendants:

(a) Knowingly concealed credible offers from Owens Corning to purchase all outstanding Masonite shares at prices significantly higher than the prices at which Masonite common stock traded during the Class Period to artificially deflate Masonite's common stock price.

(b) Repurchased Masonite shares during the Class Period while in possession of material nonpublic information regarding Owens Corning's repeated offers to acquire all outstanding Masonite shares at significantly higher than the prices at which Masonite common stock traded during the Class Period.

(c) Deceived investors by making false and misleading statements concerning the nature of Masonite's share repurchases, telling investors that the repurchases would "distribut[e]

capital back to the investor base," when in reality Defendants knew that the repurchases were at prices significantly lower than Owens Corning's repeated acquisition offers.

(d) Deceived investors by making false and misleading statements concerning Masonite's compliance with Rule 10b-18 despite the fact that Masonite's repurchases were made while Defendants were aware of material nonpublic information regarding Owens Corning's repeated acquisition offers.

(e) Misled investors by representing in SOX certifications that Masonite's 2Q23 and 3Q23 Form 10-Qs did not contain any false or misleading statements, despite knowing that these SEC filings failed to disclose Owens Corning's repeated acquisition offers.

(f) Conspired to use Deutsche Bank Research as a conduit to disseminate false and misleading statements regarding Masonite's plan to go forward with the PGTI Deal when in reality Defendants had reengaged with Owens Corning to exclusively negotiate a sale of the Company to Owens Corning for a significant premium over Masonite's then-current stock price.

(g) Misled investors by falsely and misleadingly telling investors that Defendants "remain focused" on Masonite's standalone future operational and strategic goals despite knowing a sale of the Company to Owens Corning was imminent.

199. These deceptive acts were part of a course of conduct that operated as a fraud and deceit upon Lead Plaintiff and others similarly situated in connection with their sales of Masonite common stock during the Class Period in an effort to maintain artificially low market prices for Masonite common stock.

200. Lead Plaintiff and other members of the Class who sold shares of Masonite common stock: (i) have suffered substantial damages because they relied upon the integrity of the market and sold shares of Masonite common stock at artificially deflated prices as a result of the violations of

§10(b) and Rule 10b-5 alleged herein; and (ii) would not have sold Masonite common stock at the prices they sold at, or at all, if they had been aware that the market prices had been artificially and falsely deflated by Defendants' fraudulent scheme. At the time of the sales by Lead Plaintiff and members of the Class, the fair and true value of Masonite common stock was substantially more than the prices at which they sold their shares.

201. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their sales of Masonite common stock during the Class Period.

## COUNT III

### For Violation of §20(a) of the 1934 Act Against the Individual Defendants

202. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

203. During the Class Period, the Individual Defendants acted as controlling persons of Masonite within the meaning of §20(a) of the 1934 Act. By virtue of their positions within the Company, and their power to control public statements about Masonite, the Individual Defendants had the power and ability to control the actions of Masonite and its employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action, and certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B. Declaring that Defendants are liable under the 1934 Act;

C. Awarding damages in favor of Lead Plaintiff and other members of the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest on that amount;

D. Awarding Lead Plaintiff and members of the Class their costs of suit, including reasonable attorneys' fees and expenses and expert fees; and

E. Directing such further relief as the Court may deem just and proper.

**JURY DEMAND**

Lead Plaintiff demands a trial by jury.

DATED: June 5, 2026

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
MARIO ALBA JR.
JONATHAN A. OHLMANN

*/s/ Mario Alba Jr.*
MARIO ALBA JR.

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
srudman@rgrdlaw.com
malba@rgrdlaw.com
johlmann@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

WOLF POPPER LLP
ROBERT C. FINKEL
JOSHUA W. RUTHIZER
ADAM SAVETT
845 Third Avenue, 12th Floor
New York, NY 10022
Telephone: 212/759-4600
rfinkel@wolfpopper.com
jruthizer@wolfpopper.com
asavett@wolfpopper.com

CAVANAGH & O'HARA
BRITT W. SOWLE
101 West Vandalia Street, Suite 245
Edwardsville, IL 62025
Telephone: 618/692-5250

CAVANAGH & O'HARA LLP
JOHN T. LONG
2319 West Jefferson Street
Springfield, IL 62702
Telephone: 217/544-1771
johnlong@cavanagh-ohara.com

*Additional Counsel*